**Lorna CASSADY, Plaintiff–Appellant,**

v.

**Thurman TACKETT, Individually and in his Capacity as Johnson County Jailer, Defendant–Appellee.**

No. 89–5679.

United States Court of Appeals,
Sixth Circuit.

Argued April 30, 1990.

Decided July 24, 1991.

Ned B. Pillersdorf (argued), Stumbo, Derossett & Pillersdorf, Prestonsburg, Ky., for plaintiff-appellant.

Michael J. Curtis (argued), Ashland, Ky., Pamela Todd Robinette, Stratton, May & Hays, Pikeville, Ky., for defendant-appellee.

Before KENNEDY, Circuit Judge, and ENGEL and WELLFORD,* Senior Circuit Judges.

PER CURIAM.

Lorna Cassady, Executive Director of a multi-county jail located in Johnson County, Kentucky, brought this 42 U.S.C. § 1983 action against Thurman Tackett, the Johnson County jailer, for deprivation of her substantive due process rights under the fourteenth amendment. Cassady alleges that she was forced to barricade herself in her office after Tackett and his deputies threatened to kill her. Her complaint also included pendent state claims of false imprisonment and outrageous conduct. The District Court granted defendant Tackett's motion for summary judgment on the section 1983 claim, finding that his alleged behavior had not violated any of Cassady's constitutional rights. The court then declined to accept jurisdiction over the pendent state claims and dismissed them without prejudice. We REVERSE.

* The Honorable Harry W. Wellford assumed sen-

## I. FACTS

The Big Sandy Regional Jail, located in Paintsville, Johnson County, Kentucky, was constructed through the joint efforts of Martin, Lawrence, Magoffin and Johnson Counties. Not long into the venture, a dispute arose over whether the facility would be operated by the Regional Jail Authority or Johnson County authorities, principal among them Tackett, the elected county jailer. The Regional Jail Authority initially prevailed in state court litigation on this dispute, but Tackett appealed. While the appeal was pending, the Authority agreed to employ Tackett in the jail, apparently to supervise the incarceration and handling of prisoners. Meanwhile, in the fall of 1987, the Regional Authority had appointed Lorna Cassady Executive Director of the jail.

This arrangement proved ill-advised from the start. Cassady alleges that Tackett continually contested her authority to manage the jail and that their dispute grew increasingly bitter. According to Cassady, Tackett frequently ignored her, and on one occasion stated that she had no business at the facility and that his wife should have her position. In early January 1988, in response to the latest skirmish in their administrative turf dispute, Tackett allegedly shouted at Cassady that she was restricted to a certain area of the jail and dared her to venture further. Cassady claims that Tackett emphasized the order by drawing back his coat to reveal a holstered gun. The two apparently also clashed over whether Regional Jail Authority policy prohibited Tackett and his deputies from carrying guns within the jail.

The events giving rise to this cause of action occurred on January 13, 1988, when the smoldering cinders flared. By Cassady's account, Tackett stormed into her outer office, shouting and cursing at her over the latest clash in their running conflict. Tackett was accompanied by several of his deputies, including his son Dewayne who, like Tackett, was allegedly armed that day

ior status on January 21, 1991.

as usual. Cassady claims that Tackett's son and then others threatened to kill her and her husband, who was present at the time.[1] Fearing for their safety, Cassady and her husband locked themselves in her inner office, where they remained for forty-five minutes until the county sheriff summoned by Cassady escorted them from the building.

## II. DID TACKETT ACT "UNDER COLOR OF STATE LAW"?

The initial inquiry in an action under 42 U.S.C. § 1983 focuses on two essential elements: (1) was the defendant official acting under color of state law? and (2) did the official's conduct deprive the plaintiff of a right secured by the Constitution or federal statute? *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), (*overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). We consider these questions in turn.

■ A public official has acted "under color of state law" when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West*, 487 U.S. at 49–50, 108 S.Ct. at 2255–56 (citing *Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)).[2] Thus, "before a defendant may be held liable under section 1983, that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates federal

constitutional rights." *Christian v. Belcher*, 888 F.2d 410, 414 (6th Cir.1989) (emphasis in original).

Our Circuit has held that an off-duty police officer's use of his gun could be action under the color of state law because he had authority under state law to carry the gun only by virtue of being a police officer, and because the dispute in which he used the gun originated in the performance of his official duties. *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir.1980). Other courts have also held that various official actions in the work place are taken "under color of state law." In *Ruhlman v. Barger*, 435 F.Supp. 447, 448 (W.D.Pa.1976), the court ruled that a state police commissioner and officers acted under color of state law in ordering the punitive transfer of another officer, even though such transfers were forbidden under department regulations.

■ Here, we are obliged to conclude that in allegedly flourishing and threatening to use his gun against Cassady, Tackett acted under color of state law. As in *Layne*, Tackett had authority or power to carry the gun in the jail only because he was the elected jailer of Johnson County. That Tackett acted against a fellow public employee is of no matter, as *Ruhlman* demonstrates.

## III. WAS CASSADY DEPRIVED OF A CONSTITUTIONAL RIGHT?

˙ The District Court disposed of Cassady's claim of constitutional injury by relying principally on *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The Court in *Baker* concluded that an allegedly negligent arrest based on mistaken identity could not support a section 1983 action for deprivation of liberty. While

---

**1.** It is not at all clear from the evidence whether Tackett himself threatened to kill Cassady, or whether his deputies' threats could be imputed to him. We assume either scenario for purposes of ruling on Tackett's motion for summary judgment.

**2.** The only exception which the Supreme Court has carved out from these principles is a narrow one for public officials who perform an essen-

tially private function. *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (holding that a public defender does not act under color of state law when defending a client in a criminal proceeding); *see West*, 487 U.S. at 50, 108 S.Ct. at 2256 (noting that this category is unique). The exception obviously does not apply to Tackett's situation.

generally relevant in holding that not all state tort claims rise to the level of federal constitutional deprivations, *Baker* does not speak directly to Cassady's claims, which are based on intentional, not negligent, action under color of state law.

### A. *Fourth Amendment* [3]

The fourth amendment's protection against unreasonable seizures is triggered "'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir.1989) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). "What constitutes a restraint on liberty prompting a person to conclude that [she] is not free to leave will vary with the police conduct at issue and the setting in which the conduct occurred." *Rose*, 889 F.2d at 1493. Coercive or intimidating behavior supports a reasonable belief that compliance is compelled. *United States v. Collis*, 766 F.2d 219, 221 (6th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985).

▮While nearly all seizure cases involve the arrest of a private person by a police officer, this family of precedent includes some interesting cousins. These atypical cases suggest several potentially relevant principles of law. First, it is apparent that the fourth amendment protects public officials such as Cassady from unreasonable government searches and seizures. *See, e.g., National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989) (drug testing of public employees constitutes a search under the fourth amendment); *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (plurality) (public hospital psychiatrist suspected of professional improprieties is protected against unreasonable search of his office by supervisors); *Kirkpatrick v. City of Los Angeles*, 803

F.2d 485, 489 (9th Cir.1986) (search of police officer to investigate alleged work-related misconduct must meet reasonable suspicion standard of the fourth amendment); *Security & Law Enforcement Employees v. Carey*, 737 F.2d 187, 203–04 (2d Cir.1984) (search of prison employees to investigate work-related misconduct falls under the fourth amendment); *Biehunik v. Felicetta*, 441 F.2d 228, 230 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) (the compelled appearance of 62 police officers in a lineup for possible identification as wrongdoers could be considered a "seizure" under the fourth amendment).

▮Secondly, Cassady need not have been accused of wrongdoing to enjoy the protections of the fourth amendment. "It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court*, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). *See also Lessman v. McCormick*, 591 F.2d 605, 612 (10th Cir. 1979) (plaintiff stated a 1983 claim in alleging that a police officer arrested her for a minor infraction solely to intimidate her and assist the officer's friend in recovering on an overdue loan made to her); *Inada v. Sullivan*, 523 F.2d 485, 488 (7th Cir.1975) (plaintiff stated a section 1983 action by alleging he was arrested solely because the arresting officer disliked and was prejudiced against him); *Williams v. Tansey*, 610 F.Supp. 1083, 1085 (E.D.Pa.1985) (same).

▮In this case, both the District Court and Tackett analyzed Cassady's deprivation of liberty claim under the fourth amendment. The District Court concluded that because Tackett's conduct consisted only of threats, and there was no infliction of any physical wrong, the allegations and evidence even in the light most favorable to her did not constitute a seizure. If Cassady reasonably believed that her freedom of

---

**3.** Cassady did not raise the fourth amendment issue, instead relying on a due process argument. Since the District Court and the defendant on appeal analyzed her claim under the fourth amendment as well, however, we address the issue to resolve the case completely.

movement was restrained and that she was compelled to remain within her office lest Tackett or his deputies make good their threats to kill her, she may be able to establish a seizure within the meaning of the fourth amendment. *See Rose,* 889 F.2d at 1493. The threats may have confined Cassady as effectively as fetters. That both parties here are prison officials and that this kind of conduct has no legitimate law enforcement purpose arguably is of no matter on the authority of *Von Raab, Camara* and the other cases cited above.

In *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), the Court directed that "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.... The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." In reference to claims arising under the fourth amendment's prohibition against unreasonable seizures, the Court, citing *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), noted "that the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871 (emphasis in original). Accordingly, Tackett's alleged actions must be examined under the totality of the circumstances to determine whether they were objectively reasonable. *Id.* at 397, 109 S.Ct. at 1872; *Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1699–700.

■ Tackett has not defended this action on the basis that he had a right to terrorize Cassady, thus forcing her to confine herself to her office. Further, examined under the standard of objective reasonableness, there appears to be no legitimate reason for Tackett's alleged actions as described by plaintiff. Not every threat will arise to the level of a constitutional violation, of course.[4] But where the credibility of the threats presents a jury question as to whether the threats foreseeably resulted in the seizure of the person, a constitutional violation can occur. *Cf. Black v. Stephens,* 662 F.2d 181, 188 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Douglas v. Marino,* 684 F.Supp. 395, 398 (D.N.J.1988). Since it appears that Tackett's threats did cause a loss of liberty, we need not decide what level of emotional distress, without more, is necessary to establish a constitutionally cognizable injury when the injury results from unreasonable threats of force.

### B. *The Due Process Clause of the Fourteenth Amendment*[5]

■ Cassady contends with little elaboration that her stand-off with Tackett on

---

**4.** Not all threats made by a government official will give rise to a § 1983 cause of action. Most threats that occur in the context of a dispute between co-workers will not occur under color of state law. In the case before us, the District Court determined that this action was committed under state law because Tackett's acts were facilitated by use of the unique authority granted him as the Jailer of Johnson County. This aspect of the decision was not appealed.

**5.** Cassady has alleged a substantive due process violation in her complaint. We recognize that the Supreme Court has held that a claim against police officers for the use of excessive force in the course of an arrest or other "seizure" is properly analyzed under the fourth amendment's "objective reasonableness" standard rather than under substantive due process. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Admittedly, "[a]fter *Graham,* the status of the 'shock the conscience' test in contexts other than allegations of excessive force is uncertain." *Braley v. City of Pontiac,* 906 F.2d 220, 226 (6th Cir.1990). However, the Court in *Graham* only addressed excessive use of force by police officers and we do not elect to extend the Court's holding beyond the law enforcement context.

Certainly the Supreme Court continues to recognize that the Due Process Clause has a "substantive component," *see DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989), and a due process violation may be found when a plaintiff has been deprived of a recognized property or liberty interest. Cassady's claim alleging a violation of substantive due process may properly be analyzed as such. We disclaim any attempt today to expand or contract the "ephemeral concept" of substantive due process, however, *see Gutzwiller v. Fenik,* 860 F.2d 1317, 1328 (6th Cir.1988), choosing instead to address

January 13, 1988 "shocks the conscience" in a civilized society. The "shock the conscience" language of course comes from *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), where the Court held that police conduct in pumping a suspect's stomach in search of evidence violates due process standards. In support of her claim, Cassady cites only *White v. Rochford,* 592 F.2d 381 (7th Cir. 1979). There it was held that police abandonment of an arrestee's children on a highway late on a cold night shocked the conscience and deprived them of due process rights. 592 F.2d at 383–84. Because *White* presents entirely different facts, it seems that the "shocks the conscience" holding in that case has little if any relevance to the present one. Trying to apply *White* to this case highlights the inchoate nature of the "shocks the conscience" standard, but is otherwise unhelpful. In *Braley v. City of Pontiac,* 906 F.2d 220, 224–25 (6th Cir.1990), this Circuit recently discussed this point in the context of a section 1983 suit against a police officer for false arrest, false imprisonment and malicious prosecution:

> Applying the "shock the conscience" test in an area other than excessive force ... is problematic. Not only are there fewer instances in the case law, but the "shock the conscience" test is not as uniformly applied to cases where excessive force or physical brutality is not the basis of the claim. The "shock the conscience" standard, fuzzy under the best of circumstances, becomes fuzzy beyond a court's power to interpret objectively where there is a dearth of previous decisions on which to base the standard. We doubt the utility of such a standard outside the realm of physical abuse, an area in which the consciences of judges are shocked with some degree of uniformity.

*Braley,* 906 F.2d at 226. Since the present case, like *Braley,* does not concern physical abuse, we are reluctant to apply the "shock the conscience" standard.[6]

In summary, Cassady has presented evidence from which a jury might find an illegal seizure within the meaning of the Fourth Amendment. However, her substantive due process claim falls short. Accordingly, the judgment of the District Court is REVERSED and the action REMANDED to the District Court for further proceedings.

ENGEL, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority's opinion except that portion which holds that there may have been a fourth amendment seizure here. In my judgment, the facts of this case place it well beyond the intended reach of the fourth amendment. In that one particular, therefore, I respectfully dissent.

An understanding of the context in which an alleged fourth amendment violation takes place has historically been and is still necessary to determine the amendment's reach. *See Michigan v. Chesternut,* 486 U.S. 567, 572–73, 108 S.Ct. 1975, 1978–79, 100 L.Ed.2d 565 (1988). Reduced to its essentials, we have here not a constitutional violation but merely a squabble between two individuals, each of whom in a sense was purporting to act under color of state law. They collided over what can only be called a territorial or jurisdictional dispute which got out of hand in an unseemly way.

The fourth amendment has always properly been used to strike a balance between the government's interest in law enforcement—either of criminal statutes or of substantive regulations—and the citizens' interest in individual autonomy, security and privacy. Historians agree that the fourth amendment was intended to outlaw general warrants for the search and seizure of personal property. General warrants did not require probable cause, nor did they speci-

---

Cassady's claim as alleged within the confines of present law.

**6.** Even assuming that we still see merit in the Seventh Circuit's decision in *White* that behavior other than physical violence may "shock the conscience," 592 F.2d at 384, that case concerns the far different circumstances of police treatment of private citizens in the course of law enforcement. *White* thus would not establish a due process violation in the present case.

fy particular places to be searched or items to be seized. *Chimel v. California*, 395 U.S. 752, 760–61, 89 S.Ct. 2034, 2038–39, 23 L.Ed.2d 685 (1969), and *generally*, J. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 19–48 (1966). The fourth amendment "is the one procedural safeguard in the Constitution that grew directly out of the events which immediately preceded the revolutionary struggle with England." *Id.* at 19.

In England, the general warrant had been used to enforce the crown's libel laws, which severely restricted criticism of the government. Henry VIII in 1538 gave vast search powers to his agents to restrict freedom of the press. *See* F. Siebert, *Freedom of the Press in England: 1476–1776* 48 (1952). The British government's power to issue general warrants for unrestricted searches and seizures of libelous writings was not restricted until Lord Camden, in *Entick v. Carrington*, 19 Howell's State Trials 1029 (1765), sustained a trespass verdict in favor of the victim of a general warrant. (*See generally Stanford v. Texas*, 379 U.S. 476, 481–485, 85 S.Ct. 506, 509–512, 13 L.Ed.2d 431 (1965)). William Penn then led the Parliamentary attack against the general warrant with his now famous observation:

> The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.

N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 49–50 (1937).

General warrants, particularly the form of general warrant called a "writ of assistance," were also used in the American colonies by royal customs officers to enforce British restrictions on trade and to extract revenues from the Americans. Those warrants conferred on customs officers the general power to search for and seize smuggled goods without any evidentiary basis. The general warrants lacked the safeguards of the common law warrants, which specified the place to be searched and the property to be seized, and could be issued by a judge only upon sworn testimony establishing the evidentiary basis for the search or seizure. Intending to prevent the new American government from arbitrarily exercising its law enforcement powers through the use of general searches and seizures, the framers drafted and approved the fourth amendment. Ratified as part of the Bill of Rights in 1791, it states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...

U.S. Constitution, Am. IV.

I briefly recite this history because I believe the majority today has strayed well beyond the original intent and even the modern meaning of the fourth amendment. Certainly the language of the amendment has in prior cases been properly applied to resolve problems unanticipated by the framers, such as workplace drug testing, the use of metal detectors, wire tapping, and the exercise of general police powers. Yet in each of these cases, and countless others that our courts have decided under the fourth amendment, judges have been asked to strike the proper balance between law enforcement and personal liberty—the very balance at the heart of the colonists' objections to general warrants. This balance stands at the core of the fourth amendment as it was conceived in the late 1780s and I respectfully suggest, even as it is applied by federal courts today.

In my opinion the majority errs in concluding that Tackett's unseemly behavior, even if technically construed as action under color of state law, must perforce have violated Cassady's constitutional rights. The majority finds a factual question to exist concerning whether Cassady's subjective fear (quite possibly justified) that she could not safely leave her office without being assaulted amounted, in a constitu-

tional sense, to a "seizure." The term "seizure" in our everyday speech has many meanings, but I believe we must analyze "seizure" as it is used in the Constitution since applying that term outside its historical context may lead to interpretive error. Under the majority's definition, a seizure subject to fourth amendment scrutiny can occur at any time a co-worker who happens to be cloaked with government authority infringes on the freedom of movement of a fellow employee. I respectfully suggest that this was never the intent of the fourth amendment, and goes beyond any current interpretation of the Supreme Court applying the fourth amendment.

Assuming with the majority that Tackett was acting under color of state law, as that phrase has been interpreted under 42 U.S.C. § 1983, I agree that a police officer's exercise of arbitrary or excessive force, or a government official's discretionary abuse of power which goes beyond the scope of his or her authority will usually have been performed under color of state law for purposes of section 1983 liability. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (thirteen City of Chicago police officers acted under color of state law when they broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room in the house). Yet our inquiry into Tackett's liability should not end with this determination. "Thus, before a defendant may be held liable under section 1983, that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates *federal constitutional rights*." *Christian v. Belcher*, 888 F.2d 410, 414 (6th Cir.1989) (emphasis added). Although *Belcher* directly involved first amendment rights, the observation appears equally valid in the application of the fourth amendment.

The majority has failed to explain how *constitutional*, rather than state common law rights have been violated by Tackett's action. The majority's reasoning opens up the specter that the fourth amendment can be invoked by any government employee who feels that a co-worker has unreasonably detained her beyond her scheduled working hours to finish a project, has unreasonably asked her to work on a weekend, or has made the government worker feel that she should confine her workspace to one room rather than another. Cassady's apprehensions may extend beyond those hypothesized above, but I see nothing which would allow us to draw principled distinctions between these differing harms. "The search and seizure provision as finally drafted and adopted, had both the virtue of brevity and the vice of ambiguity." Landynski, *Search and Seizure, supra,* p. 42.

In all fourth amendment cases today, as in the early colonial challenges to the general warrant, courts must weigh the government's need to inspect and investigate against the public's desire to be left alone. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989) (drug testing of public employees constitutes a search under the fourth amendment); *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (no fourth amendment seizure when police drove alongside defendant as he ran); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (school officials investigating student misconduct must abide by the fourth amendment); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (requiring warrant for government's use of electronic listening device); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (requiring warrant for fire, health and housing code inspections). These are of course but a small sample of the dozens of fourth amendment cases the Supreme Court has considered in recent decades. In each, including all of the fourth amendment cases cited in the majority opinion [1], the government argued that its action was legally justified in the interest of law en-

---

**1.** Both the *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), and the *Douglas v. Marino,* 684 F.Supp. 395 (D.N.J.1988), cases cited in the majority's discussion of the fourth amendment were analyzed and decided on fifth or eighth amendment grounds.

forcement, while the aggrieved party—often but not always a criminal defendant—argued that our vital national concern for personal liberty and privacy had been threatened by the government's action.

No such dichotomy exists before us. No one argues that Tackett's action was justified as a law enforcement action or otherwise. Cassady's claim that her liberty and privacy have been violated leaves us with scarcely half of the fourth amendment balance of interests. In my view this alleged wrong should be remedied, if at all, through a state law tort action.

Undoubtedly, "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). It is also true that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987). Still we should recognize that application of the term "seizure" in its constitutional sense may differ from our own everyday use of that word. Judges apply law to particular facts, and the facts of this case do not implicate the fourth amendment as written by the framers nor applied by the Supreme Court.

Cassady did not feel any greater threat because Tackett was a government employee than she would have felt had he been any other person brandishing a gun and making verbal threats. Tackett did not even pretend that because he was a government employee he had a legal right to confine Cassady. Just as surely, Cassady viewed Tackett as a vexatious, gun-toting co-worker, but not as a jailer cloaked with authority to throw her in jail. The matter would be entirely different had Tackett, as jailer, confined a member of the public improperly.

The excessive force cases to which the majority analogize this case are quite different. In those cases, the fourth amendment's concern that the enforcement of our laws be balanced against fundamental notions of privacy, personal security and liberty was clearly at issue. In my opinion

those cases are fundamentally different, for no one can possibly contend that there was any law enforcement interest in Tackett's actions.

Neither Cassady, Tackett or anyone else could view what Tackett did as anything remotely similar to the exercise of a legal duty as an officer of the government or as an enforcer of the laws. He was an office bully; nothing more, nothing less. While police officers sued for the use of excessive force may argue—successfully or not, depending on the facts—that unusual measures were needed to carry out their duties, Tackett cannot and does not argue that he had a right to confine Cassady to her office as part of his official functions. The fourth amendment's balance between the interests of law enforcement and personal liberty has no relevance to this workplace turf battle between two strong-willed co-workers who happened to receive their paychecks from the government. The majority's concern that Tackett's action may well have been "objectively unreasonable" as that term is discussed in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), ignores the fact that we must first have before us a claim properly arising under the fourth amendment before we may consider whether the action at issue was reasonable thereunder.

The indignity suffered by Cassady may very well permit her successfully to pursue a claim for false imprisonment under Kentucky law. "The action for the tort of false imprisonment ... protects the personal interest in freedom from restraint of movement." Prosser & Keeton, *The Law of Torts* 47 (5th Ed.1984). "The restraint may be by means of physical barriers, or by threats of force which intimidate the plaintiff into compliance with orders. It is sufficient that the plaintiff submits to an apprehension of force reasonably to be understood from the conduct of the defendant, although no force is used or even expressly threatened." *Id.* at 49.

While undoubtedly Tackett had no legal right to make Cassady feel threatened and confined, the prohibition on his action arises in the common law of torts, not in

the Constitution, for Tackett's conduct did not imply a claim of legal authority to act as he did. Cassady alleges that she was forced to barricade herself in her office and feared for her safety for forty-five minutes. Accepting her allegations as true, as we must when reviewing a summary judgment, Tackett's behavior was unseemly and reprehensible, but we trivialize the Constitution by holding that the document speaks to this incident. As we noted in *Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir.1990), "[t]he protections of the Constitution are not coextensive with the protections of the common law...."

I agree with the majority's conclusion that the defendant's actions are not violative of the substantive component of the fourteenth amendment's due process clause. In this respect the Supreme Court's discussion in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), seems particularly apt. "The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195, 109 S.Ct. at 1003.

This has been a most difficult case and I respectfully suggest that my difference with the majority is in an analysis of the various approaches which may be made under the Constitution to the unique facts of this case. It is difficult indeed to fit them comfortably within any particular analysis found in existing case law, but to me, at least, a more rational analysis would confine the liability potential in such circumstances to the more narrow range of substantive due process if for no other reason than that fourth amendment analysis, either historical or modern, simply does not make sense in this context. On the contrary, the best arguments to be mustered both in favor of and against the existence of a constitutional violation here seem to lie in the substantive due process cases. Even there, however, I am fully in agreement with the majority that the defendant's conduct does not measure up to the stringent requirements of that component. A further factor supporting this type of analysis lies in the circumstances which underlie the dispute which is at action. To me at least, it is rather obvious that the underlying dispute between these individuals—who had the right to control what area of the jail—is uniquely one for state and local law. It is one which in my opinion can and should be left to resolution at the local level. In other words, this is the sort of dispute in which the federal courts as a matter of policy should be loathe to wield those powers conferred under section 1983.

The fourth amendment stands as a potent limit on the exercise of the government's power to invade our homes and even our bodies, to seize our property and to learn information which we wish to keep private. On either an objective or subjective basis, no one, least of all the parties themselves, ever conceived that the defendant was acting in a law enforcement capacity in confining Cassady to her office. I would affirm the district court's summary judgment in favor of defendant Tackett.