**NORTHWEST TISSUE CENTER, Department of the Puget Sound Blood Center, a Washington Corporation, and Oregon Tissue Bank, a Department of the Emmanual Hospital and Health Center, a Legacy Health System Affiliate, an Oregon Corporation, Plaintiffs–Appellants,**

v.

**Donna E. SHALALA,[1] Secretary of the United States Department of Health and Human Services, and David Kessler, Commissioner of the United States Food and Drug Administration, Defendants–Appellees.**

No. 93–1078.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1993.

Decided July 27, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 24, 1993.

---

**1.** After this case was commenced in the district court, Donna E. Shalala succeeded Louis W. Sullivan as Secretary of the Department of Health and Human Services. Her name has been substituted for his in the caption. Fed. R.Civ.P. 43(c).

George M. Burditt (argued), Alan I. Becker, Deborah B. Norton, Jamie S. Freveletti, Burditt & Radzius, Chicago, IL, for plaintiffs-appellants.

Thomas P. Walsh, Asst. U.S. Atty., Crim. Div., Chicago, IL, William M. Zoffer (argued), Drake Cutini, Dept. of Justice, Consumer Litigation, Washington, DC, for defendants-appellees.

Before BAUER, Chief Judge, MANION and ROVNER, Circuit Judges.

BAUER, Chief Judge.

In this appeal we revisit the United States Food and Drug Administration's ("FDA") treatment of human heart valve allografts[2] as devices under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–394 ("the FDC Act") and its implementing regulations. The district court dismissed the plaintiffs' complaint, ruling that it was mooted by our holding in *Alabama Tissue Center v. Sullivan*, 975 F.2d 373 (7th Cir.1993). In *Alabama Tissue*, we dismissed a petition challenging an FDA notice interpreting one of its regulations because the notice was not a "regulation" subject to direct appellate review. *Id.* at 379. Although two of the plaintiffs' three claims were mooted by that ruling, we believe count three of the plaintiffs' complaint should not have been dismissed, and remand this case to the district court for proceedings consistent with this opinion.

## I. Background

### A. Statutory Framework

Our review of the plaintiffs' claims requires us to delve into the bowels of the regulatory framework imposed by the FDC Act. The Medical Device Amendments of 1976 classify medical devices[3] into three categories—Class I, II, and III—to reflect the devices' relative safety and effectiveness. 21 U.S.C. § 360c(a). Class I devices are the safest, followed by Class II, and then Class III. *See* 21 U.S.C. § 360c(a)(1). *See also Becton, Dickinson, & Co. v. FDA*, 589 F.2d 1175, 1177 (2d Cir.1978) (discussing classification scheme). Examples of Class III devices include pacemakers, artificial heart valves, and other products intended to be implanted in the body or designed to sustain human life. 21 U.S.C. § 360c(c)(2)(C)(i). The Act imposes significant restrictions on the marketing of Class III devices to minimize the risk of harm they pose to consumers. One of these requirements is premarket approval. 21 U.S.C. § 360e. Before a Class III device may be distributed commercially, manufacturers must submit extensive data to the FDA for review. The FDA examines the data and must approve the manufacturer's application before a device can be marketed.

2. Allografts are human heart valves, recovered from deceased human donors, which are preserved and stored for transplantation.

3. Section 321(h) defines the term "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro agency, or other similar or related article...."

*Id.* Application for premarket approval is an onerous process, *see* 21 U.S.C. § 360e(c); Congress estimated that manufacturers would need thirty months to complete the process. 21 U.S.C. § 351(f)(2)(B)(i).

To ease the burden of the process and minimize the disruption to the market, Congress requires the Secretary of the FDA to regulate devices that were in commercial distribution in 1976 (when the amendments were adopted) in two steps. The two-step procedure allows these preamendment Class III devices to remain in circulation while the FDA evaluates them. First, the Secretary is required to classify all preamendment devices into one of the three classes outlined in 21 U.S.C. § 360c. The Secretary must publish the proposed classification in the Federal Register. The notice of proposed classification invites comment from interested persons and is intended to put manufacturers on notice to enable them to begin to prepare a premarket approval application for their devices. If the Secretary proposes that a device be classified as Class III, it is referred to a scientific panel for its review and recommendation respecting the appropriate classification of the device. § 360c(c). The panel's recommendation is published in the Federal Register, and interested persons are given the opportunity to comment. § 360c(d). After notice and comment, the Secretary publishes the regulation classifying a device as Class III.

In the second step of the process, the Secretary promulgates a second regulation to require manufacturers to submit applications for premarket approval. 21 U.S.C. § 360e(b)(1). The Secretary is to publish the proposed regulation in the Federal Register, again with opportunity for comment by interested persons. *Id.* The proposed regulation must include proposed findings "with respect to the degree of risk of illness or injury designed to be eliminated or reduced by requiring the device to have an approved application for premarket approval and the benefit to the public for the use of the device." 21 U.S.C. § 360e(b)(2)(A). After the final

rule requiring submission of premarket approval applications is published, a manufacturer must complete the premarket approval process within ninety days or thirty months from the date the final classification regulation was promulgated, whichever is longer. 21 U.S.C. §§ 351(f)(2)(B)(i), (ii). A device that does not satisfy these requirements is deemed adulterated and is subject to seizure. The manufacturer is subject to sanction. 21 U.S.C. § 351(f)(1).

The FDA issued a regulation in 1980 classifying replacement heart valves as Class III devices, 21 C.F.R. § 870, 45 *Fed.Reg.* 7948 (1980). The 1980 regulation identified a replacement heart valve as a

> device intended to perform the function of any of the heart's natural valves. This device includes valves constructed of prosthetic materials, biologic valves (e.g. porcine valves), or valves constructed of a combination of prosthetic and biologic materials.

21 C.F.R. § 870.3925. A second regulation promulgated in 1987 subjects replacement heart valves to premarket approval. 21 C.F.R. § 870, 52 *Fed.Reg.* 18162 (1987). Both regulations were enacted pursuant to the notice and comment provisions of the FDC Act, 21 U.S.C. § 360e, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. Things proceeded swimmingly until 1991.

In 1991, the FDA issued a "Notice of applicability of a final rule." ("NAFR") 56 *Fed.Reg.* 29177 (June 26, 1991). The NAFR informed manufacturers that allografts are subject to the 1980 and 1987 regulations governing replacement heart valves. The NAFR posed difficulties for allograft manufacturers: it announced that to continue distributing allografts, manufacturers were required to have an approved premarket approval application in effect within ninety days, a far cry from the thirty months Congress estimates is required for premarket approval.[4] Allografts had been distributed commercially for years with no indication from the FDA that they were subject to the

---

4. In the alternative, allografts could be distributed for investigational use only if they met the requirements of 21 U.S.C. § 360j(g) and 21

C.F.R. § 812, which impose a different set of procedural hurdles.

replacement heart valve regulations. Because they were unprepared for the premarket approval process, manufacturers confronted the substantial likelihood that they would need to pull their products from the market or face sanctions for selling adulterated devices. Indeed, the NAFR threatened as much. 58 *Fed.Reg.* 29178 (citing 21 U.S.C. § 351(f)(1)(A)). Further, none of the manufacturers participated in the notice and comment proceedings conducted when the replacement heart valve regulations were promulgated in 1980 and 1987.

**B. Allograft Litigation History**

Six not-for-profit allograft manufacturers petitioned this court for direct appellate review of the FDA's NAFR under 21 U.S.C. § 360(a), (g). That section authorizes review within thirty days of promulgation of final FDA regulations which require premarket approval of medical devices. *Alabama Tissue*, 975 F.2d at 374. The petitioners also filed suit in district court challenging the FDA's action, seeking injunctive and declaratory relief.[5] In the petition to this court, the manufacturers alleged that the 1991 NAFR was a new "regulation" challengeable under § 360(a)(g) because allografts were not previously subject to the regulations governing other heart replacement valves. *Id.* at 378–79. This new regulation was promulgated without notice or comment, the manufacturers argued, in violation of the FDC Act and the APA. The FDA countered that the NAFR was not a new regulation, but an interpretation of an existing regulation. For that reason, the agency claimed, this court lacked jurisdiction to review the NAFR. *Id.* at 376–77.

Because our jurisdiction depended on whether the NAFR was a regulation, 21 U.S.C. § 360(g), the jurisdictional and substantive issues overlapped. *Id.* at 376. The NAFR itself purported to be an interpretation of the earlier regulations. *Id.* at 377 ("[T]he summary of the NAFR specifically states 'the FDA is issuing a notice to clarify that replacement heart valve allografts, de-

vices, are subject to a final rule that was issued by FDA on May 13, 1987.'") (quoting the NAFR). Applying the analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we concluded that the NAFR was a permissible interpretation of the regulations. For that reason we held that the NAFR was not a regulation, but an interpretive rule. We dismissed the petition for lack of jurisdiction under § 360g. *Alabama Tissue*, 975 F.2d at 379.

After we dismissed their petition, petitioners pursued their suit in the district court—it had been stayed pending our decision. The government filed a motion to dismiss the petitioners' (now plaintiffs') complaint under Fed.R.Civ.P. 12(b)(6). The complaint charged that: (1) the FDA does not have authority to regulate the distribution of human heart valves under the FDC Act; (2) the FDA's attempt to require premarket approval of allografts under the 1980 and 1987 regulations violates the procedural requirements of the FDC Act §§ 360c(d) and 360e(b), which dictate the procedures the FDA must follow to promulgate a regulation that requires premarket approval; and (3) the FDA wrongfully denied plaintiffs the right to comment on the 1980 and 1987 regulations in violation of the Administrative Procedure Act ("APA") and the FDC Act because nothing in the regulations or administrative record provided notice that the regulations would apply to allografts. This lack of notice, they contend, violated the provisions of the Act which set forth procedures for notifying interested persons, 21 U.S.C. §§ 360c(b)–(d), 360e(b), and the Due Process Clause of the Fifth Amendment.

The defendants argued to the district court that the plaintiffs' claims should be dismissed because this court decided them in *Alabama Tissue*. The district court agreed, and dismissed the complaint as moot. The petitioners contended in this court that allografts could not be "devices" because they are human heart tissue. As the court correctly

---

**5.** The D.C. Circuit has advised that "careful counsel" in doubt of the proper forum for their claims pursue this dual filing strategy to protect their clients' claims. *See, e.g., Investment Com-*

*pany Institute v. Board of Governors of the Federal Reserve System*, 551 F.2d 1270, 1280 (D.C.Cir. 1977).

found, we ruled that the definition of device is broad enough to permit the FDA to regulate human tissue distribution under the Act. *Alabama Tissue Center v. Sullivan*, No. 91 C 6515, slip op. at 4, 1992 WL 349646 (N.D.Ill. Nov. 12, 1992) ("Mem. & Order"); *Alabama Tissue*, 975 F.2d at 378–79.[6] The district court also acknowledged our conclusion that the NAFR is not a final rule subject to the notice and comment procedures set forth in the APA, 5 U.S.C. § 553 because it is a permissible interpretation of the 1980 and 1987 regulations. Mem. & Order at 4. Relying on these rulings, the district court dismissed counts one and two of the complaint. The district court also found that our opinion moots the plaintiffs' claim in count three— that they were not on notice that the regulations included allografts:

> "[T]he Court of Appeals determined that the definition of replacement heart valves 'clearly encompasses matters relating to human organisms.' *Id.* at 11. The Court further determined that although plaintiffs claim that 'biologic valves' only refer to animal valves and not human valves.... [T]he list and example contained in the definition [of replacement heart valves] are clearly not intended to be all inclusive." *Id.* at 12. Therefore the Court dismissed plaintiffs' allegation that they were not reasonably put on notice of the content of the regulations. Moreover, the Court noted that review of such claims should only be granted in exceptional circumstances and plaintiffs failed to provide convincing justification for review. *See Id.* at 12, n. 2. Thus, plaintiffs were not wrongfully denied the right to comment on the 1980 and 1987 regulations.

Mem. & Order at 6. Finding all the plaintiffs' claims mooted by our decision, the district court granted the defendants' motion to dismiss. Two of the plaintiffs appeal.

## II. Analysis

### A. Standard of Review

 We review the dismissal of a complaint under Federal Rule of Procedure 12(b)(6) *de novo.* We accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir.1991). A court can dismiss a complaint only if the plaintiff cannot establish any set of facts upon which relief can be granted. *Id.*

### B. The Vitality of the Plaintiffs' Complaint

 We believe the district court correctly dismissed the first two counts of the plaintiffs' complaint pursuant to our ruling in *Alabama Tissue.* As discussed *supra* at note 5, we expressly rejected plaintiffs' contention in count one that the FDA lacks authority to regulate human tissue under the FDC Act. *Alabama Tissue*, 975 F.2d at 378. As for count two, we held that the NAFR is an interpretation of a regulation, not a legislative rule subject to the notice and comment provisions of the APA and the FDC Act. *Id.* at 379.

We cannot dispose of count three so easily. The plaintiffs argue that the agency promulgated a back door amendment to the 1980 and 1987 regulations to regulate allografts. This back door procedure denied them the right to notice and comment on the regulation of allografts which the FDC Act and the APA guarantee. According to plaintiffs, the agency also thereby dodged the FDC Act's requirement that a scientific panel review classifications of devices. The plaintiffs contend that the FDA gave no indication when it promulgated the regulations that allografts were deemed "replacement heart valves," and, therefore, judicial review of their claim is not foreclosed by the thirty-day limitations period imposed by 21 U.S.C. § 360g.

---

**6.** We noted the expansive definition the agency and the courts have given "device," and Congress' definition of "device" to include "implant." *Alabama Tissue*, 975 F.2d at 378 (quoting 21 U.S.C. § 321(h)). The FDC Act defines the term "implant" to include "tissue ... inserted or grafted into the body for prosthetic, therapeutic, diagnostic, or experimental purposes." *Id.* Based on this definition, and the definition of "implantation," we concluded that heart valve allografts reasonably fit within the definition of implants and, therefore, may be considered devices. *Id.*

**528**

The plaintiffs' claim finds parallels in several lines of authority which explore the procedural protections which should be afforded those affected by administrative agency action. These lines of authority include cases which consider an agency's ability to promulgate a final rule that differs significantly from the proposed one. *See, e.g., Shell Oil Co. v. EPA,* 950 F.2d 741, 751 (D.C.Cir.1991).

> [I]t was the business of the EPA, not the public, to foresee that possibility and address it in its proposed regulations.... Under the standards of the APA, 'notice must necessarily come—if at all—from the Agency'.... [A]mbiguous comments and weak signals from the agency gave petitioners no such opportunity to anticipate and criticize the rules or to offer alternatives.

*Id. See also American Medical Ass'n v. United States,* 887 F.2d 760, 767 (7th Cir. 1989) (final rule valid because "logical outgrowth" of proposed rule); *Natural Resources Defense Council v. EPA,* 824 F.2d 1258, 1282–85 (1st Cir.1987) (final rule invalid because proposed rule did not give adequate notice of its terms, i.e. final rule not "logical outgrowth" of proposed rule); *BASF Wyan-*

*dotte Corp. v. Costle,* 598 F.2d 637 (1st Cir. 1979) (same).[7] The issues plaintiffs raise have also been considered when (1) an agency has issued 'interpretations' of rules which differ from a court's prior interpretation, *see, e.g., Chamber of Commerce v. OSHA,* 636 F.2d 464 (D.C.Cir.1980), or the agency's prior interpretation, *see, e.g., National Family Planning v. Sullivan,* 979 F.2d 227 (D.C.Cir. 1992); *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety,* 874 F.2d 205, 206 (4th Cir.1989) ("Statement of Interpretation" changing agency's enforcement policy actually substantive amendment to regulation subject to notice and comment), or (2) an agency has announced creative interpretations of regulatory language. *Usery v. Kennecott Copper Corp.,* 577 F.2d 1113, 1117 (10th Cir. 1977). In *Usery,* for example, the Secretary of Labor interpreted a regulation which stated ladders "shall be provided" to mean employers "shall require use" of ladders. *Id.* at 1118–19. The court rejected the interpretation:

> Kennecott was not required to assume the burden of guessing what the Secretary intended plain and unambiguous words employed in the safety regulations to mean. This is especially true when viola-

**7.** Of this line of cases, we find the D.C. Circuit's decision in *Fertilizer Institute v. EPA,* 935 F.2d 1303 (D.C.Cir.1991), particularly helpful. The petitioners challenged two administrative exemptions to CERCLA (the Comprehensive Environmental Response, Compensation & Liability Act, 42 U.S.C. §§ 9601–9675) announced by the EPA in a final rule promulgated under § 553 of the APA. The proposed rule did not mention the possible creation of administrative exemptions. The EPA argued that the proposed rule provided adequate notice nevertheless because it included a discussion of *statutory* exemptions to CERCLA. 935 F.2d at 1311. The D.C. Circuit disagreed.

> Under the EPA's argument, the petitioners were responsible for inferring from the proposed rule's reference to statutory exemptions that the creation of administrative exemptions might be considered. Implicit in this argument is the notion that a reference to a specific topic (here, statutory exemptions) can give rise to notice of the existence of a more general topic (here, exemptions in general) and that the general topic, in turn can encompass notice of a second specific topic (here, administrative exemptions) only remotely related to the first specific one. Such reasoning, if accepted by the court, would turn notice and

comment rulemaking into a guessing game in which the inclusion of one subject indicates that a distant cousin of that subject might be addressed. This reading of the APA cannot be sustained.

*Id.* at 1311. In the instant case, the agency's argument would be that regulation of mechanical and animal valves provides notice that all heart valves are being regulated. This general regulation provides notice that human heart valves are being regulated. Like the D.C. Circuit, we have our doubts about this form of attenuated notice.

The court also rejected the agency's contention that the new rule was a logical outgrowth of the proposed one. To determine if a final rule is a logical outgrowth of the proposed one, the court must decide "whether the purposes of notice and comment have been adequately served." *Id.* A final rule is "the logical outgrowth of a proposed rule if a new round of notice and comment would not provide commenters with 'their first occasion to offer new and different criticisms which the agency might find convincing.'" *Id.* (quoting *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1225 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)). The court also refused to accept the EPA's argument that the notice must have been adequate because some comments addressed administrative exemptions.

tion of a regulation subjects one to criminal or civil sanctions. A regulation cannot be construed to mean what an agency intended but did not adequately express. If the Secretary were to be permitted to interpret regulations by employing the unusual meaning of words, employers would be deprived of fair notice of that which is expected of them in violation of their due process rights.

*Id.* [citations omitted]. *See also Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir.1976) ("open-sided floor" could not be interpreted to include "open-sided roof").

We also find discussions of these issues in cases in which an agency has ducked procedural requirements imposed by Congress. *See Becton, Dickinson & Co. v. FDA,* 589 F.2d 1175, 1182 (2d Cir.1978); *Usery,* 577 F.2d at 1117. Although it is not directly on point, in *Becton,* the Second Circuit chided the FDA for "procedural brinkmanship" similar to the kind plaintiffs allege here. *Becton Dickinson,* 589 F.2d at 1182. The opinion sheds some light on our analysis. *Becton,* like this case, involved the Secretary's implementation of the medical device amendments to the FDC Act. These amendments, as we have discussed *supra,* direct the Secretary to classify devices into one of three categories based upon their safety and effectiveness. The amendments also give the Secretary the authority to inspect facilities manufacturing "restricted devices." 589 F.2d at 1178.

The medical device amendments define "restrictive device" as "a device subject to a regulation under this subsection." 21 U.S.C. § 360j(e)(1). The Secretary did not promulgate new regulations under the amendments to announce which devices were restricted. *Id.* at 1179. Instead, a week after the amendments became law, the Secretary published a notice in the Federal Register entitled "Implementation of the Medical Device Amendments Act of 1976." *Becton,* 589 F.2d at 1180. This document stated in part that "Restricted devices include all prescription devices as now defined in 21 CFR 801.-109.... Additional notices and proposed regulations will be published in future issues of the Federal Register...." *Id.* The document also stated that FDA representatives

planned to inspect facilities manufacturing restricted devices as the document defined them. *Id.* The government, as in this case, conceded that notice and comment procedures had not been followed before the document was published. The FDA simply regarded the document as "fair advice" to the industry of its position. To wit, the agency believed that the previously adopted prescription device regulation was sufficient under § 360j(e) to regulate "restricted devices" under the new amendments. *Id.*

The plaintiff manufactured devices "intended for use by or on the prescription of a physician....." *Id.* (We cannot tell from the opinion exactly what kind of devices.) The FDA attempted to inspect plaintiff's facility and records. When plaintiff balked, the FDA obtained a warrant. *Id.* To prevent further invasions, plaintiff sued, seeking injunctive relief barring FDA inspections until the agency promulgated regulations defining "restrictive devices" as the FDC Act required. *Id.*

The Second Circuit refused to allow the agency to bootstrap the regulation of restricted devices under the prescription device regulation. It acknowledged that the Secretary's construction of the regulations reflected "common sense" because the terms "prescription" and "restricted" incorporated similar safety standards. Nevertheless, it found that

> Congress was careful to provide a rulemaking procedure in which all participants would have a full opportunity to present their views and analyses of the data underlying the proposed regulation[, and] ... intended that the Secretary ... determine that the particular restriction on sale, distribution or use is justified by the risks presented by the device.

*Id.* at 1181. The court invalidated the rule because the Secretary failed to follow Congress' directives to conduct notice and comment rulemaking. It rejected the FDA's argument that the notice and comment period for the prescription device regulation was adequate to allow prescription device manufacturers to present their views of regulation under the FDC Act. The court explained that those comments would not have been

addressed to the constraints imposed by the restrictive device amendments, but to the regulatory exemptions provided in the prescription device regulations. The court concluded that despite the FDA's broad discretion to regulate matters affecting public health, because of congressional emphasis on careful procedures and regulations, it could not sanction FDA's regulation of restricted devices under the prescription device regulations. *Id.* at 1181–82. *See also National Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 382–84 (2d Cir.1978) (rejecting FDA Secretary's attempts to justify failure to provide notice and comment before promulgating final rule).

■ Issues plaintiffs raise in count three have also been considered by courts wrestling with ripeness in the administrative context. The D.C. Circuit has explained that timeliness and ripeness, although somewhat related and often confused, are not the same thing. "It is the duty of the court to make the prudential judgment whether a challenge to an agency action is ripe; it is the responsibility of petitioners to file for review within the period set by Congress." *Eagle–Picher Indus.*, 759 F.2d at 912. Nevertheless, in some exceptional circumstances a petitioner's failure to file a timely challenge may be "forgiven" because the party "lacked a meaningful opportunity to challenge the agency action during the review period due to, for example, inadequate notice that the petitioner would be affected by the action...." *Id.* at 911; *Recreation Vehicle Indus. Ass'n v. EPA*, 653 F.2d 562, 568 (D.C.Cir.1981).[8]

> [T]he statutory time limit restricting judicial review of agency action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule ... of further agency action applying it. For unlike ordinary adjudicative orders,

administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties affected by a rule an opportunity to question its validity.

*NLRB Union v. Federal Labor Relations Authority*, 834 F.2d 191, 195–96 (D.C.Cir. 1987) (quoting *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959)). *See also Investment Company Institute v. Board of Governors of the Federal Reserve System*, 551 F.2d 1270, 1280 (D.C.Cir.1977) ("Where the right to petition for review within 30 days after promulgation of a regulation does not provide an adequate remedy, alternative means may be utilized to bring a claim before this court.").

■ We believe plaintiffs may be "forgiven" for failing to file a timely challenge to the 1980 and 1987 regulations because the facts they allege indicate that they may not have received adequate notice of the effect of the regulations. Common themes in the lines of authority we have cited cement our decision to "forgive" the untimeliness of the plaintiffs' challenge to the FDA's heart valve regulations.[9] Proper promulgation does not necessarily render a regulation valid for all time or for all purposes. "[B]ecause an administrative order or regulation which may have appeared valid at one time may not be valid, a statutory time limit on judicial review cannot cut off forever all review of administrative decisions." *Illinois Central Gulf R.R. Co. v. ICC*, 720 F.2d 958, 961 (7th Cir.1983) (citing *Geller v. FCC*, 610 F.2d 973, 978 (D.C.Cir. 1979); *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959)). Courts have developed a cluster of policies to protect the rights of parties affect-

---

8. Before any litigant reasonably can be expected to present a petition for review of an agency rule, he first must be put on fair notice that the rule in question is applicable to him. Otherwise the agency could promulgate a confusing regulation and, after expiration of the time for any judicial contest, clarify it to the surprise and prejudice of a party whose opportunity for judicial review meanwhile has been extinguished.

*Recreation Vehicle*, 653 F.2d at 568.

9. We have discussed some of these issues in *Commonwealth Edison Co. v. United States Nuclear Regulatory Comm'n*, 830 F.2d 610, 614–15 (7th Cir.1987) (considering challenge to licensing application fee brought three years after promulgation of regulation setting application fees).

ed by agency action, and yet preserve the finality of agency action: If the statute authorizing agency action requires the agency to solicit data and comments from interested parties, the parties ought to have a meaningful opportunity to present these materials to the agency before it embarks upon a course of action, particularly if the agency can impose criminal or civil sanctions for violations of its regulations.[10] An agency should not be able to avoid the notice-and-comment process with fancy interpretive footwork.[11] Nevertheless, parties cannot sit on their rights and wait for a convenient moment to challenge agency action.[12]

Count three presents a form of ripeness argument—plaintiffs could not have challenged the regulations within the statutory period because they did not know that they were aggrieved by them until the NAFR was published in 1991. *See RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 730 (D.C.Cir.1985) ("Although statutory time limitations on judicial review of agency action are jurisdictional, self-evidently the calendar does not run until the agency had decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's con-

tent.") (citation omitted); *Geller*, 610 F.2d at 973 (changed circumstances allow challenge to continued vitality of regulations). *See also Raton Gas*, 852 F.2d at 615 ("[A] litigant may still, under certain circumstances, question an agency regulation after the expiration of the statutory period for direct review."); *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 911 (D.C.Cir.1985) (challenge to regulation promulgated a year earlier untimely).

This court has reviewed agency decisions after the statutory time limit expired when "no one had any reason to challenge the decision when it was made ... because it was unlikely to have much impact..." *Illinois Central*, 720 F.2d at 961 (jurisdiction to review regulation promulgated two years earlier). *See also Commonwealth Edison Co. v. United States Nuclear Regulatory Comm'n*, 830 F.2d 610 (7th Cir.1987) (challenge to licensing application fee brought three years after promulgation of regulation setting application fees). Other courts have allowed challenges years after the agency promulgated the regulation. *See Natural Resources Defense Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 602 (D.C.Cir.1981);

**10.** *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 153, 87 S.Ct. 1507, 1518, 18 L.Ed.2d 681 (1967) ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance...."), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Shell Oil Co. v. EPA*, 950 F.2d 741, 759 (D.C.Cir.1991) ("Where the imposition of penal sanctions is at issue, however, the due process clause prevents that deference [to agency expertise] from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.").

**11.** *See National Family Planning v. Sullivan*, 979 F.2d 227, 231 (D.C.Cir.1992) ("When an agency promulgates a legislative regulation by notice and comment directly affecting the conduct of both agency personnel and members of the public, whose meaning the agency announces as clear and definitive to the public, ... it may not subsequently repudiate that announced meaning and substitute for it a totally different meaning

without proceeding through the notice and comment rulemaking normally required for amendments of a rule."); *Homemakers Northshore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir.1987) ("The judicial responsibility to accept the agency's interpretation comes from the existence of (a) a *decision* that was (2) taken in a procedurally regular way ... a *volte face* may be an attempt to avoid the notice and opportunity for comment that the Administrative Procedure Act requires for the alteration of a rule.") (emphasis in original); *Panhandle Eastern Pipe Line Co. v. F.E.R.C.*, 613 F.2d 1120 (D.C.Cir.1979) ("We agree that 'the Commission's broad responsibilities ... demand a generous construction of its statutory authority,' but we do not believe the Commission should have authority to play fast and loose with its own regulations."), *cert. denied*, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980); *Usery*, 577 F.2d at 1117.

**12.** *See Raton Gas*, 852 F.2d at 615; *Small Ref. Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C.Cir.1983); *Natural Resources Defense Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 602 (D.C.Cir.1981) ("We have previously suggested that those who have had the opportunity to challenge general rules should not later be heard to complain of their invalidity on grounds fully known to them at the time of their issuance.").

*Geller v. FCC*, 610 F.2d 973, 978 (D.C.Cir. 1979) (jurisdiction to review regulations promulgated five years earlier).

Plaintiffs' pleading in count three is sufficient to sustain their claim (at least through a motion to dismiss) that the FDA did not provide notice of its intent to regulate allografts under the replacement heart valve regulations when it promulgated the regulations. Complaint, ¶ 38–40, R.Doc. 1. Certainly the FDA did not enforce the regulations against allografts during the five-year period between the promulgation of the premarket approval regulation and the issuance of the NAFR. Further, documents in the record indicate that FDA officials informed plaintiffs during this intervening period that "FDA continues to maintain that they have authority over processors of human source valves, but they choose not to exercise that authority at this time." Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, Exhibit B to Exhibit 14, R.Doc. 12. Allograft manufacturers could have interpreted this comment as a representation that the Secretary believed she possessed statutory authority to regulate allografts, but was not currently regulating them. If she was not yet exercising her statutory authority, the FDC Act seems to require her to promulgate regulations before she did so.[13] These facts suggest that the plaintiffs could not have known when the regulations were promulgated that they would be governed by them. "Though our review of an agency's final decision is relatively narrow, we must be strict in reviewing an agency's compliance with procedural rules." *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1103 (4th Cir.1985) (citing *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 641 (1st Cir.1979), *cert. denied sub nom., Eli Lilly & Co. v. Costle*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980)). *Accord Wyerhauser Co. v. Costle*, 590 F.2d 1011, 1013 (D.C.Cir.1978).

■ We emphasize it is not the substance of the FDA's interpretation, but the manner in which it was announced that we believe

merits review. Congress imposed very significant procedural restrictions on the FDA's ability to regulate medical devices. These restrictions were designed to minimize the disruption of the commercial marketing of medical devices. *See* S.REP. No. 94–33, 94th Cong., 1st Sess. 3, 11 (March 11, 1975); H.R.REP. No. 94–853, 94th Cong., 2d Sess. 42 (Feb. 29, 1976), U.S.Code Cong. & Admin.News 1976, pp. 1070, 1072, 1080. Fundamental fairness requires that we ensure that the agency has not nullified the thirty-month grace period Congress provided to allow medical device manufacturers to comply with the amendments to the Act. *Cf. Small Ref. Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 542 (D.C.Cir.1983) (EPA promised in proposed regulation to give potential regulatees adequate lead time before enacting new regulatory standards—"Unless EPA had a strong reason for breaking its promise of adequate lead time, a court might well have concluded that its action was arbitrary.").

## C. Effect of *Alabama Tissue*

■ The defendants argue that plaintiffs' claim is foreclosed by our ruling in *Alabama Tissue*. The district court agreed and granted the defendants' motion to dismiss. Mem. & Order at 6. We believe the defendants and the district court have read our opinion, perhaps understandably, too broadly. In *Alabama Tissue*, we were asked to determine whether the NAFR was a final rule. The petitioners contended that the FDA violated the FDC Act and the APA because it promulgated a new substantive rule, but skipped the procedures Congress required for classifying and regulating Class III devices. Because the FDA did not intend to regulate allografts when it promulgated the regulation in 1980, the argument went, the NAFR's imposition of a premarket approval requirement in 1991 must have been a final rule. We ruled the NAFR was a permissible interpretation of the 1980 and 1987 regulations and held that it was not a final rule.

---

**13.** We recall our responsibility when we review the dismissal of a complaint to draw all reasonable inferences in the plaintiffs' favor.

We denied the petition for direct review under 21 U.S.C. § 360g.

The defendants assert that our ruling that the interpretation was permissible closes the door on plaintiffs' contention that the notice was inadequate. According to defendants, a permissible interpretation, *ipso facto*, makes any notice the agency provided adequate. At oral argument, counsel for the FDA asserted that if an interpretation is permissible, it "defies logic to suggest that there has been no notice given of that interpretation." We disagree.

Suppose an agency charged with regulating the nation's highways promulgates regulations requiring "all vehicles" to conform to certain safety standards. For five years the agency enforces these standards only against automobiles of various types. Then it publishes a notice in the Federal Register announcing that the regulations also apply to bicycles. The dictionary definition of vehicle ("A device, such as a car or sled, for carrying passengers, goods, or equipment; conveyance....." [14]) reasonably encompasses bicycle as a permissible interpretation. Nevertheless, it seems silly to suggest that the nation's bicyclists would have been "on notice" at the time the regulations were promulgated that the agency's standards applied to their bikes.

In fact, a ruling from the D.C. Circuit impliedly rejects the FDA's argument. In *Shell Oil Co. v. EPA,* 950 F.2d 741, 753–56 (D.C.Cir.1991), a petition challenged the EPA's construction of the statutory term "treatment" in a final regulation. The court analyzed the EPA's interpretation under *Chevron,* and determined that it was permissible. *Id.* Then, the court considered separately whether there was adequate notice and opportunity for comment on the agency's usage and application of the term. *Id.* at 756. The court thereby implicitly rejected the FDA's argument here that a permissible interpretation means by definition that the agency provided adequate notice.

The FDA argues that a ruling from a district court in this Circuit supports their contention that a permissible interpretation renders any notice and comment procedure adequate. *See Sima Products Corp. v. McLucas,* 460 F.Supp. 128 (N.D.Ill.1978), *aff'd,* 612 F.2d 309, 312 (7th Cir.1980). We do not agree with the agency's reading of *Sima Products.* In that case, plaintiff asked the head of the FAA to promulgate an amendment to an FAA regulation governing notice to passengers of the effects of X–Ray inspection on film. The regulation required signs in airports to indicate that only X–Ray and scientific film could be harmed by X–Ray inspection. Plaintiff contended that the signs were misleading. The FAA denied the petition to amend the rule. Plaintiff sued the agency and asked the district court to declare that the regulation was void and to direct the agency to promulgate a new regulation requiring accurate signs. The district court granted the defendants' 12(b)(6) motion. 460 F.Supp. at 129.

In addition to its substantive challenge to the regulation, the plaintiff challenged the sufficiency of the FAA's notice procedures under the APA and the FAA's governing regulations. Despite its participation in the notice and comment process conducted when the regulation was proposed, the plaintiff alleged it had received inadequate notice of the FAA's film warning regulation. According to the district court:

It is well established that an agency's notice to the public of proposed rule-making is sufficient under 5 U.S.C. § 553(b) where the substance of the proposed rule is announced, *National Industrial Traffic League v. United States,* 396 F.Supp. 456, 460 (D.C.D.C.1975) and where interested parties are given a reasonable opportunity to participate, *Forester v. Consumer Products Safety Comm'n,* 559 F.2d 774, 787 (D.C.Cir.1977). Furthermore, as the court in *Forester* concluded, 5 U.S.C. § 553(b) "provides at least as much protection as does the Fifth Amendment." *Id.* at 787. Defendant's notice of rule-making that was published in the *Federal Register* meets the reasonableness standard of *Mullane v. Central Hanover Bank,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In a situation such as this, where all parties interest-

14. *American Heritage Dictionary* 1340 (2d College ed. 1991).

ed in the promulgation of a rule may not be known to defendant, it is simply not reasonable or practical to require defendant to give more adequate notice.

*Sima Products*, 460 F.Supp. at 133. The court ruled that the notice the agency provided was satisfactory. We find minimal support in this case (or in our opinion affirming it [15]) for the proposition that affected persons are necessarily put on notice of all permissible interpretations of agency regulations, regardless of the course of proceedings and history of the regulation. *Sima Products* held simply that an agency need not give personal notice to parties of rulemaking.

The defendants also argue that interpretive rules never require notice and comment. The cases upon which they rely in their brief to support this argument are distinguishable from the facts presented in this case. *See Indiana Dep't Pub. Welfare v. Sullivan*, 934 F.2d 853, 855 (7th Cir.1991); *American Bancorporation v. Board of Governors of Fed. Reserve Sys.*, 509 F.2d 29, 34–35 (8th Cir. 1984). In *Indiana Dep't*, the Secretary of Health and Human Services disallowed federal contributions to the State's nursing homes. The Secretary refused to pay because the state agency charged with conducting a survey of the nursing homes required by HHS failed to conduct the survey according to the terms of an HHS operations manual. 934 F.2d at 855. The manual required the survey to be conducted after the nursing homes began treating patients. Indiana surveyed some facilities before they began treating patients. HHS promulgated regulations setting forth the data the survey was designed to collect. Although the regulations did not specifically include the requirement that facilities be treating patients when the surveys were conducted, much of the data could only be gathered if patients were in-house. *Id.* Indiana argued that the in-house requirement was not valid because it was not promulgated under APA procedures.

This court disagreed. We found the in-house rule was implicit in the promulgated

regulations—indeed the regulatory standards were "nonsensical unless they were read to include a patient-in-the-house requirement." *Id.* at 855. HHS could not enforce the survey regulations without the in-house requirement. In this case, however, regulation of other types of replacement heart valves is not "nonsensical" without the regulation of allografts. Further, allograft regulation is not required to enforce the promulgated regulations against other replacement valves.

In *American Bancorp.*, the petitioners challenged an amendment to the bank holding company regulations that were promulgated without notice and comment. The amendment narrowed the scope of activities that the original language of the regulation apparently authorized. 509 F.2d at 34. The court ruled that the amendment was an interpretive rule, exempt from notice and comment. The amendment was an interpretive rule because it not only narrowed the scope of the original regulation; "it makes explicit what was implicit under that regulation." *Id.*

Again, this case is distinguishable from *American Bancorp.* In *Bancorp.*, the new interpretation *narrowed* the scope of the existing regulations. Here, the Secretary's interpretation expands the scope of the regulation. Whether the interpretation was "implicit" in the original regulation brings us back to the question of whether the FDA provided adequate notice of its intent to regulate allografts as replacement heart valves.

In *Alabama Tissue*, the plaintiffs argued briefly that even if the NAFR was not a final rule, we could review the 1987 regulation because allograft manufacturers were not reasonably placed on notice of the content of the 1987 regulation, and because the regulation "remained clearly unripe for review during the statutory review period." *Alabama Tissue*, 975 F.2d at 379 n. 2. We noted the brief argument in a footnote, and cited one case which might support the petitioners' invitation to review the 1987 regulation. The footnote is set out fully in the margin.[16] We

---

15. Indeed, before this court, the plaintiff admitted it had notice of the proposed regulation, but argued that the agency was required to conduct a "true hearing" on the merits of plaintiff's position before it promulgated the rule. We did not agree. *Sima Products*, 612 F.2d at 312.

16. In reliance on law from the District of Columbia Circuit, petitioners also briefly argue

stated, however, that petitioners had not offered a convincing justification to follow the D.C. Circuit. We did not expressly consider the adequacy of the notice provided by the 1980 and 1987 regulations. Indeed, we could not have considered the petitioners' invitation to review the adequacy of the FDA's notice of the impact of the 1987 regulation, and impliedly refused to do so, because we declined petitioners' request to supplement the appellate record with records of the proceedings leading to the promulgation of the 1980 and 1987 regulations. We stated, perhaps prematurely, that these records were not "material." *See Alabama Tissue*, 975 F.2d at 376. *See also American Bancorporation v. Board of Governors of Fed. Reserve Sys.*, 509 F.2d 29, 34–35 (8th Cir.1984) (discussing informal record including submissions in response to request for comment). Because we declined to review the very evidence that might present "convincing justification" for their failure to file within the statutory period, we do not believe the plaintiffs should be barred from presenting the more developed claim they pursue in count three to the district court. *See Eagle–Picher*, 759 F.2d at 909 (Court may consider untimely claim when there is "clear evidence that a failure to consider a petitioner's claims would work a manifest injustice."). Further, we believe the 1980 and 1987 regulations should be reviewed together because both regulations are necessary to subject allografts to premarket approval under the regulatory scheme imposed by the FDC Act. We believe count three of the complaint correctly raises the connection between the two regulations.

At oral argument, counsel for the FDA contended that "it is disingenuous" for plaintiffs to suggest that they were deprived of notice in the early 1980s, because the technology that makes allografts marketable commodities (the preservation techniques which extend their shelf life) did not emerge until the mid-to-late 1980s. If we bear in mind that all facts and reasonable inferences must be viewed in the light most favorable to the plaintiffs, this accusation strengthens the plaintiffs' position. If allografts were not in commercial distribution, would processors know that a regulation affected them? Indeed, if allografts were not in commercial distribution, they might not be subject to the classification and regulation scheme for "preamendment" devices imposed by the statute and applied to replacement heart valves in the 1980 and 1987 regulations. *See* 21 U.S.C. § 360c(f) (discussing regulation of devices "which [were] not introduced or delivered for introduction into interstate commerce for commercial distribution before May 28, 1976.").[17]

 The FDA also opined at oral argument that entrants in regulated fields must apprise themselves of even a "potential for enforcement" of regulations against their products. We believe requiring parties to divine a "potential for enforcement" from a five-year-old regulation is a little much. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C.Cir.1991) ("Interested parties cannot be expected to divine the EPA's unspoken thoughts."). *Accord MCI Telecommunications Corp. v. FCC*, 765 F.2d 1186, 1191 (D.C.Cir.1985) ("It would be patently unfair to hold that an agency's *entirely unspoken* (or impenetrably obscure) belief that Proposition B follows from Holding A may be the

---

that even if the NAFR is not a final rule, this Court has jurisdiction to review the 1987 Regulation although the statutory time limit for review has expired.

First, petitioners claim that they were not reasonably placed on notice of the content of the 1987 Regulation. *See Raton Gas Transmission Co. v. F.E.R.C.*, 852 F.2d 612, 615 (D.C.Cir. 1988). Second, they allege that the 1987 regulation remained clearly unripe for review during the statutory review period, or 30 days of its promulgation. *See id.* However, the District of Columbia [sic] has only granted such review in exceptional circumstances. *Id.* Petitioners provide no convincing justification.

17. Moreover, in the preamble to the classification regulation for cardiovascular devices, the FDA stated, "Devices that were solely for experimental or investigational use or that were not generally available were not usually included.... Additional cardiovascular devices, which are not included in this list and which were commercially available before May 28, 1976, will be added to the list as necessary." Proposed Rule on Classification of Cardiovascular Devices, 44 *Fed. Reg.* 13285 (1979). Allograft processors may have relied on this preamble if the allograft market was still in its infancy when the FDA began regulating cardiovascular devices.

basis for precluding judicial review of Proposition B . . .") (emphasis in original) (citation omitted). Parties may foresee possible areas of regulation, but "[u]nder the standards of the APA, 'notice must necessarily come—if at all—from the Agency'. . . . [A]mbiguous comments and weak signals from the agency [do not give interested parties an] opportunity to anticipate and criticize the rules or to offer alternatives." *Shell Oil*, 950 F.2d at 751.

We are reluctant to dismiss cavalierly the plaintiffs' notice claim, particularly because the FDA seems to have stated its intention *not* to regulate allografts before it issued the NAFR. It now threatens to sanction allograft manufacturers for selling adulterated devices. "If a court mistakenly gives an agency interpretation the force of law, 'an especially odious frustration is visited upon the affected private parties: they are bound by a proposition they had no opportunity to help shape and will have no meaningful opportunity to challenge when it is applied to them.' ". *National Family Planning v. Sullivan*, 979 F.2d 227, 240 (D.C.Cir.1992) (quoting Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 YALE J. ON REG. 1, 58 (1990)). *See also Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1119 ("A regulation cannot be construed to mean what an agency intended but did not adequately express.").

We believe our ruling pays proper heed to the caution of the D.C. Circuit:

In considering the need for or propriety of judicial review in a particular case, we must recognize that terms like 'order' or 'request' may be terms of conclusion rather than analysis. . . . If linguistic technicalities are honored, and the practicalities of administrative involvement are ignored, we will have in truth unleashed a 'monster which rules with no practical limits on its discretion.'

*Independent Broker–Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 139 (D.C.Cir.) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)), *cert. denied*, 404 U.S. 828 (1971). *See also Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1105 (4th Cir.1985) ("[A]lthough

helpful, verbal formulations are not omnipotent talismans, and . . . in the final analysis each case 'must turn on how well the notice that the agency gave serves the policies underlying the notice requirement."). Judge Bazelon suggested that giving agencies a free rein to impose new interpretations on existing regulations threatens our democratic society. *See Chamber of Commerce v. OSHA*, 636 F.2d 464, 471–72 (D.C.Cir.1980) (Bazelon, J. concurring). Although we do not believe the FDA's regulation of allografts imperils our constitutional democracy, we do think the plaintiffs are entitled to present their claim.

Finally, as we explained in *Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n*, 679 F.2d 1218, 1220 (7th Cir.1982), "[t]he district court is arguably the more appropriate venue to review informal agency action" because the lack of a formal record requires that evidence be gathered to reconstruct the agency's actions. Whether the agency provided adequate notice of its intention to regulate allografts is essentially a factual question. We noted in *Alabama Tissue* that the records the petitioners proffered of the promulgation proceedings were incomplete. 975 F.2d at 376. The district court is better equipped than we to manage the gathering and presentation of evidence, and to conduct the necessary factual inquiry. *See Denberg v. United States R.R. Retirement Bd.*, 696 F.2d 1193, 1196 (7th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984).

We remand the case to the district court to examine whether the agency provided adequate notice of its intention to regulate allografts under the replacement valve regulations. The court should consider the content of the agency's publications in the Federal Register, including the scientific literature the agency cited. *See* 44 *Fed.Reg.* 13284 (1979) (classification of cardiovascular devices); 44 *Fed.Reg.* 13387 (1979) (classification of replacement heart valves); 45 *Fed. Reg.* 7948 (1980) (same); 51 *Fed.Reg.* 5296 (1986) (premarket approval); 52 *Fed.Reg.* 18162 (1987) (same). In this appeal the plaintiffs contend that none of this literature discusses allografts. The FDA contends that

allografts are discussed. We believe the content of the medical literature might shed light on the adequacy of the notice the agency provided. The court should examine the proposed findings published pursuant to 21 U.S.C. § 360e(b)(2)(a) to determine whether they apply to allografts. The state of the marketing and development of allografts at the time the regulations were promulgated might also shed light on the validity of the agency's contention that it provided adequate notice that allografts would be regulated. The court might also examine whether the scientific panel which considered the classification of heart valves also considered allografts. Generally, however, we leave to the district court the selection of evidence it deems relevant to its inquiry into the adequacy of the FDA's notice.

## III.

For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.