Cynthia KERNATS, Plaintiff–Appellant,

v.

Thomas O'SULLIVAN, et al.,
Defendants–Appellees.

No. 93–3086.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1994.

Decided Sept. 16, 1994.

Eugene Christopher Edwards (argued), Cook County Legal Assistance Foundation, Harvey, IL, for plaintiff-appellant.

Jennifer A. Pritz, Thomas G. DiCianni (argued), Robert K. Bush, Ancel, Glink, Diamond & Cope, Chicago, IL, for defendants-appellees.

Before FLAUM and ROVNER, Circuit Judges, and CRABB, Chief District Judge.*

* The Honorable Barbara B. Crabb, of the Western District of Wisconsin, sitting by designation.

FLAUM, Circuit Judge.

Cynthia Kernats (and members of her family)[1] filed a five-count complaint under 42 U.S.C. § 1983 against her former landlord, Carl Uthe, and various members of the Village of Tinley Park Police Department seeking damages and declaratory relief[2] for alleged violations of their rights under the Fourth and Fourteenth Amendments. Specifically, the Kernats alleged that the defendants' actions constituted an unreasonable seizure of persons, an unreasonable seizure of property, an unreasonable search of property, and a violation of substantive due process. They also filed a pendent state claim against Uthe for wrongful eviction. The defendants filed motions to dismiss under Fed. R.Civ.P. 12(b)(6), which the district court granted. The court also dismissed the pendent state claim for lack of subject matter jurisdiction. On appeal, Cynthia Kernats contests the judgments in favor of two defendants, Officer Thomas O'Sullivan and Police Chief James J. Wade, on Counts I and IV of the complaint. We affirm.

I.

For purposes of reviewing a dismissal under Rule 12(b)(6), we take the factual allegations of the Kernats' complaint as true. Sometime in April, 1991, the Kernats entered into a one-year, written lease of a home in the Village of Tinley Park, Illinois. The Kernats occupied the premises on May 1, 1991, and all went well for the first three months. The Kernats, however, failed to make their August and September rent payments because of financial difficulties occasioned by medical problems that befell two of their children. On September 2, pursuant to 735 ILCS 5/9–209, the Kernats' landlord, Carl Uthe, served a landlord's ten-day notice demanding payment of back rent. After ten days had expired without payment, Uthe initiated forcible entry and detainer proceedings in Cook County Circuit Court, seeking the back rent and possession of the premises. The court entered an order granting Uthe the relief he sought, but stayed the possession order until November 30.

On Saturday, November 30, Uthe began making efforts to ensure that the Kernats vacated the premises, though not by posting a cash fee with the Cook County Sheriff that day, as he was required to do under Illinois law to obtain enforcement of the court's order.[3] Instead, Uthe took matters into his own hands by barging into the Kernats' home and rummaging through their personal belongings in an effort to determine whether they were prepared to leave by midnight. In conversations with the Kernats, Uthe made several threats to throw the family out if they failed to go of their own volition by 12:01 a.m.

Later that day, Cynthia Kernats telephoned the Tinley Park Police Department to find out if Uthe had the legal authority to forcibly remove the Kernats from their home. An unidentified individual (named in the complaint as "John Doe"), representing himself as the "senior officer in command", informed Cynthia that Uthe could evict them on his own authority, without the involvement of the Sheriff's Department.

Midnight came and went, and Carl Uthe was not far behind. At approximately 1:30 a.m. on Sunday, December 1, Uthe posted "No Trespassing" signs around the house and on the garage. Around 9:00 a.m., Andrew Kernats (Cynthia's husband), telephoned the police department to verify whether Uthe could use self-help to accomplish the eviction. An individual believed to be Officer Robert Silkas informed Andrew that self-help eviction was improper and that his landlord would have to place an eviction order with the Sheriff's Department. Andrew then was transferred to another person

---

1. All of the Kernats were listed as plaintiffs in the original complaint, but only Cynthia Kernats is a party to this appeal.

2. Although the Kernats' prayer for relief requested declaratory relief, it is apparent that they seek only a finding that their civil rights have been violated and relief only in the form of damages.

3. At all times relevant to the events detailed in the complaint, Ill.Rev.Stat. ch. 34 § 3–6019 delegated the duty of enforcing and executing judgments of the Circuit Court of Cook County to the Sheriff of Cook County. No provision of Illinois state law permitted local police departments to enforce forcible entry and detainer judgments.

at the department who informed him that Uthe was presently at the station filing a criminal trespass complaint and asked him to call back later. Andrew Kernats subsequently telephoned the police department every hour until 3:00 p.m. at which time he spoke with Officer James Montgomery. Montgomery stated that Uthe could evict the Kernats himself and added that a Tinley Park police officer would be stopping by the Kernats' home to discuss the situation.

About 4:30 p.m., Officer Thomas O'Sullivan arrived at the Kernats' residence and was met at the door by Cynthia Kernats. O'Sullivan identified himself as the Watch Commander and entered the Kernats' house. Once inside the house, O'Sullivan looked down a hallway and commented that it did not appear to him that the Kernats were preparing to move. O'Sullivan next told Cynthia that it was "her own fault that they were in the present situation" and threatened to arrest everyone in the family if they did not vacate the premises that evening. In response, Cynthia informed O'Sullivan of her understanding that only the Cook County Sheriff could forcibly evict a tenant. O'Sullivan replied that he "did not care about the Cook County Sheriff" and pointing to his badge, stated in Wyatt Earp-like fashion that "this is Tinley Park and that's what town you are in, my town, and when in my town, you do as I tell you . . . therefore everyone better be out before I return this evening."

O'Sullivan then departed and Uthe returned to the premises shortly thereafter. Spurred by O'Sullivan's threat, the Kernats family hurriedly attempted to remove as many of their personal belongings as possible, though some of their property was destroyed in the process. Uthe monitored the move, and Tinley Park police vehicles periodically drove by the residence throughout the evening. At 2:00 a.m. the move was complete, though the Kernats were unable to find a temporary residence where the whole family could stay together.

On December 11, Tinley Park Police Chief James J. Wade contacted Andrew Kernats and requested that he come to the police station to discuss an anonymous letter received by the Village that made allegations about certain police officers relating to the events of December 1 and threatened to inform the press of the incident. Later that day, Andrew and Cynthia Kernats met with Chief Wade and an unidentified special investigator. Wade showed the Kernats a copy of the unsigned letter, an incident report prepared by Officer O'Sullivan, and various other documents. The Kernats were not permitted to photocopy the letter, though they were allowed to examine it for as long as they desired. After the Kernats presented their account of what transpired on December 1, Wade offered his view that a possible "miscommunication between shifts" may have caused an officer to temporarily mislead the Kernats into thinking they had to vacate the premises or be arrested for criminal trespass. Wade also stated that "all Tinley Park Police Officers knew of the prohibition against evicting tenants." Finally, Wade told the Kernats that he would contact them again after reviewing the matter.

About a week later, Wade sent a letter to the Kernats thanking them for meeting with him and further explaining the department's resolution of the matter. Wade detailed the steps taken by the department to convince Uthe to contact the Sheriff's Department and attributed the apparent conflict between O'Sullivan and the Kernats to a communication breakdown and a misinterpretation of O'Sullivan's actions and intentions.

Unsatisfied by Wade's response, the Kernats sued Chief Wade and Officers Montgomery, Doe, and O'Sullivan under 42 U.S.C. § 1983, seeking damages and declaratory relief for alleged violations of their rights under the Fourth and Fourteenth Amendments. Specifically, they alleged that the defendants' actions constituted an unreasonable seizure of persons (Count I), an unreasonable seizure of property (Count II), an unreasonable search of property (Count III), and a violation of substantive due process (Count IV). The complaint also named Carl Uthe as a defendant in the civil rights counts and in a pendent state law claim (Count V) for wrongful eviction. The various defendants filed motions to dismiss under Fed. R.Civ.P. 12(b)(6), which the district court granted. The court dismissed Counts I and

II on the ground that neither the Kernats nor their property had been seized by any of the defendants. Count III was dismissed because the complaint failed to allege a search of the Kernats' residence. With respect to Count IV, the court ruled that the Kernats' substantive due process claim must fail because of their failure to satisfy the less stringent standard required for a Fourth Amendment violation. The court dismissed the civil rights claims against Uthe, a private citizen, because the complaint failed to allege a conspiracy between Uthe and the police officers. Because the Kernats failed to state a claim against any of the officers, the court also dismissed the claims against Chief Wade alleging a constitutional violation on the basis of his alleged ratification of the officers' conduct. Finally, having disposed of the federal claims, the court dismissed the pendent state claim for lack of subject matter jurisdiction. On appeal, Cynthia Kernats contests only the judgments in favor of two defendants, Officer Thomas O'Sullivan and Police Chief James J. Wade, on Counts I and IV of their complaint. For the reasons stated below, we affirm the judgment of the district court.

## II.

■ "[B]efore a defendant may be held liable under [42 U.S.C. § 1983], that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates federal constitutional rights." *Christian v. Belcher*, 888 F.2d 410, 414 (6th Cir.1989) (emphasis in original); *see also Soldal v. Cook County, Ill.,* — U.S. —, —, 113 S.Ct. 538, 543 n. 6, 121 L.Ed.2d 450 (1992); *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), *overruled on other grounds, Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As the Supreme Court has stated, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (citing *Monroe*, 365 U.S. at 172, 81 S.Ct. at 476); *see also Cassady v. Tackett*, 938 F.2d 693, 700 (6th Cir.1991) (Engel, J., concurring in part and dissenting in part) ("[A] government official's discretionary abuse of power which goes beyond the scope of his or her authority will usually have been performed under color of state law for purposes of section 1983 liability."). Of course, every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation. *See Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir.1992). Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible.

■ The first step in analyzing a § 1983 claim is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, — U.S. —, —, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (plurality opinion of Rehnquist, C.J.) (citations omitted). In this instance, Kernats' primary allegation is that O'Sullivan violated her Fourth Amendment right to be free from unreasonable seizures. In particular, Kernats contends that what began as a consensual police-citizen encounter ripened into a seizure when she complied with O'Sullivan's ultimatum that her family quickly vacate the premises or face arrest and confinement. O'Sullivan responds that his conduct did not amount to a seizure, and, even if it did, he is entitled to qualified immunity because his actions did not violate clearly established law. The district court concluded that the Kernats had not adequately stated a claim based upon an alleged seizure because they had made "no attempt to reconcile their position ... with the [ ] case law, which finds a 'seizure' within the meaning of the Fourth Amendment when circumstances lead a person to believe he or she was not free to *leave.*" Mem. Op. at 1178 (emphasis in original). The court therefore did not need to address O'Sullivan's qualified immunity defense. Our review of the district court's dismissal under Rule 12(b)(6) is *de novo, Northwest Tissue Center v. Shalala,* 1 F.3d 522, 527 (7th Cir.1993). A defendant may raise a qualified immunity defense in a motion to dismiss, but at this stage of the proceedings the only facts before us are those alleged in the complaint, which we are obliged to accept as true. *Albright,* — U.S. at —, 114 S.Ct. at 810; *Mc-*

*Donald v. Haskins,* 966 F.2d 292, 292 (7th Cir.1992).

■ Under the doctrine of qualified immunity, "governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Elder v. Holloway,* — U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Since *Harlow,* courts have employed an objective test for determining whether public official defendants are entitled to qualified immunity. *See Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). The objective standard protects the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions "with independence and without fear of consequences." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739 (citing *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)). As this court has stated, qualified immunity "gives public officials the benefit of legal doubts," *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992), by relieving them from having to decide, at their financial peril, how judges will decide future cases. *Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th Cir.1991).

■ Once a defendant has pleaded a defense of qualified immunity, it is appropriate for courts to approach the issue using a two-step analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *See Siegert v. Gilley,* 500 U.S. 226, 231–232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.) *(en banc ), cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). In *Anderson v. Creighton,* the Supreme Court

explained the right allegedly violated must have been "clearly established" in a "particularized" sense and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident. 483 U.S. 635, 639–640, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *see also Auriemma v. Rice,* 910 F.2d 1449, 1455 (7th Cir.1990) *(en banc ), cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). In delimiting the contours of a right, we look first to case law on point or in closely analogous areas because it "permit[s] us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). Of course, this does not mean that plaintiffs must direct the court to a case that is "precisely on all fours on the facts and law involved here;" *Landstrom v. Illinois Dep't of Children and Family Servs.,* 892 F.2d 670, 676 (7th Cir.1990), indeed, one need not cite a case at all if the constitutional violation is obvious. *See Eberhardt v. O'Malley,* 17 F.3d 1023, 1028 (7th Cir.1994) ("This is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles."); *see also Nelson v. Streeter,* 16 F.3d 145, 151 (7th Cir.1994); *McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir.1992); *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990). In the usual case, though, courts review existing case law, focusing on particularized facts and concrete legal principles, to discern "the clarity of the state of the law in relation to the defendant's conduct at the time the conduct occurred." *Triad,* 10 F.3d at 496. In so doing, courts must not identify too abstractly the level of generality of the relevant legal "rule", *McDonald,* 966 F.2d at 293, because "[g]overnmental employees must obey the law in force at the time but need not predict its evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant." *Greenberg,* 922 F.2d at

385. Viewed as a whole, the doctrine of qualified immunity erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is "designed to shield from civil immunity 'all but the plainly incompetent or those who knowingly violate the law.'" *Donovan*, 17 F.3d at 952 (citations omitted).

We may not deny O'Sullivan the shield of qualified immunity unless Kernats can establish that as of December 1, 1991, O'Sullivan's alleged conduct violated clearly established rights under the Fourth Amendment. Kernats concedes that "after an exhaustive search of authority, she has, to date, been unable to locate any case directly on point." Br. at 18. This deficiency, of course, is not fatal by itself because we must determine qualified immunity in light of all relevant precedents—both those cited by the parties and those we discover ourselves. *Cf. Elder*, —— U.S. at ——, 114 S.Ct. at 1021 (holding that appellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to or discovered by the district court).

■ Kernats has stated a Fourth Amendment cause of action if (1) O'Sullivan's conduct constituted a "seizure" and (2) the seizure, if one occurred, was "unreasonable." *Donovan*, 17 F.3d at 948. As an initial matter, we must bear in mind that every encounter between police and citizens is not a seizure, *see Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968), and even unreasonable, unjustified, or outrageous conduct by an officer is not prohibited by the Fourth Amendment if it does not involve a seizure (or, in the appropriate case, a search). *See Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir.1992). In *United States v. Mendenhall*, the Supreme Court stated the test for a seizure as follows: "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not *free to leave*." 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (emphasis supplied). Applying the *Mendenhall* test, the district court dismissed the

Kernats' seizure claim because they made no allegation that they were not free to leave the premises or the presence of Officer O'Sullivan at any time. The court did articulate the unusual nature of the Kernats' claim—that they were seized not because they were not free to *leave* their home, but rather because they were not free to *remain* there—but gave the claim no further consideration in view of the Kernats' failure to cite any case law in support of their novel theory.

■ In our view, the district court needed to conduct an additional inquiry into the basis for the Kernats' Fourth Amendment seizure claim. Although the Kernats' theory is indeed novel (as they concede), the Supreme Court's post-*Mendenhall* pronouncements have restated and refined the framework through which the Kernats' allegations should have been analyzed. First, the Court recognized that for purposes of applying the objective test of coercion, when a person has no desire to leave the scene of an encounter with police, "the degree to which a reasonable person would feel he or she could leave is not an accurate measure of the coercive effect of the encounter." *Florida v. Bostick*, 501 U.S. 429, 435–36, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). In such a situation, "the appropriate inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter." *Id.* This test calls for a "contextual approach," that takes into account all of the circumstances surrounding the incident. *See Michigan v. Chesternut*, 486 U.S. 567, 572–573, 108 S.Ct. 1975, 1978–79, 100 L.Ed.2d 565 (1988); *I.N.S. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir.1991); *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir.1989) ("What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary with the police conduct at issue and the setting in which the conduct occurred."). The Supreme Court has identified a number of factors that might suggest that a seizure has occurred, even where the person who may have been seized did not attempt to leave, including:

the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (citations omitted). Lower courts have added to this list, for example deeming the prolonged retention of a person's personal effects or a request by an officer to accompany him to the police station or a police room to be relevant considerations. *See, e.g., Springer*, 946 F.2d at 1016; *United States v. Battista*, 876 F.2d 201, 205 (D.C.Cir.1989). While these factors are not exclusive, they form an appropriate starting point for our inquiry. Second, the *Bostick* Court emphasized that only restraints on personal liberty caused by police conduct are relevant to the Fourth Amendment seizure analysis; independent factors (such as the cramped confines of a crowded bus) should not weigh in our calculus. 501 U.S. at 435–37, 111 S.Ct. at 2387; *United States v. Jordan*, 951 F.2d 1278, 1281 (D.C.Cir.1991). And, finally, in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Court stated that the objective measure was itself only a threshold requirement for the finding of a seizure and that additionally the citizen must "actually yield to a show of authority from the police or be physically touched by the police." *Hodari D.*, 499 U.S. at 625–26, 111 S.Ct. at 1550; *Tom v. Voida*, 963 F.2d 952, 957 (7th Cir.1992); *Jordan*, 951 F.2d at 1281.[4] Thus, as our colleagues on the D.C. Circuit have noted, it is clear after *Hodari D.* that "not only must the encounter meet an objective test of coercion but a subjective one of subjection." *Id.*

■ Was it clearly established in the law that the Kernats' compliance with O'Sullivan's alleged order to pack up and leave the house or face arrest and detention at some unspecified time later in the evening was a seizure? As the above discussion indicates,

this question, like constitutional matters generally, is "one of degree." *Cohan v. Commissioner of Internal Revenue*, 39 F.2d 540, 545 (2d Cir.1930) (L. Hand, J.). While this does not mean that nothing in the area can ever be clearly established, when the factual setting is unique in non-trivial aspects, with no clear parallel in other cases, the relevant constitutional factors must point strongly in the direction of constitutional transgressions before immunity is lost. *Cf. Feldman v. Bahn*, 12 F.3d 730, 733 (7th Cir.1993), *petition for cert. filed*, 62 U.S.L.W. 3844 (June 7, 1994). In seizure law, we believe that two overarching themes emerge from the cases: (1) the nature and degree of the official inducement, and (2) the extent of the restriction on the citizen's desired freedom of movement. The first of these themes reflects the type of threatening police action, as noted in *Mendenhall*, and the cost of ignoring the official's demands, while the second informs whether the citizen had reasonable options available to him. To be sure, our construct does not form a perfect dichotomy because some relevant factors will influence both areas of inquiry. It does, however, organize in a useful way the critical ingredients bearing on the main issue here—whether O'Sullivan's show of authority, and the response it induced, amounted to a unconstitutional seizure.

■ As the *Mendenhall* factors imply, coercive or intimidating police behavior tends to support a belief that compliance is compelled. *See Cassady v. Tackett*, 938 F.2d 693, 696 (6th Cir.1991) (decided July 24, 1991). An extreme example of such behavior was demonstrated in *Cassady*, one of the few cases located in our research that also involved the alleged restraint of the plaintiff's freedom of movement by an official threat. In *Cassady*, the executive director of a multi-county jail brought a § 1983 claim against the county jailer alleging that she was forced to barricade herself in her office when the jailer and his deputies, after brandishing

---

**4.** Under this test, a fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement has been terminated by an intentional application of physical force or by the suspect's submission to the asserted authority. *Hodari D.*,

499 U.S. at 626–27, 111 S.Ct. at 1551; *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (noting that a suspect who had eluded pursuing police cars with flashing lights for twenty miles was not seized until his fatal crash into a roadblock).

weapons, threatened to kill her and her husband, who was present at the time. The Sixth Circuit, noting that "[t]he threats may have confined Cassady as effectively as fetters," 938 F.2d at 697, concluded that Cassady presented evidence from which a jury might find an illegal seizure within the meaning of the Fourth Amendment. *Id.* at 698. Had O'Sullivan remained at the Kernats home with his gun drawn after issuing the threat, the claim of seizure would be stronger—and, perhaps more importantly, more clearly established because of *Cassady*. *See McDonald*, 966 F.2d at 294 (indicating that a single case from another circuit may be sufficient to support a finding of clearly established law); *but see Kikumura v. Turner*, 28 F.3d 592, 596 (7th Cir.1994) ("[W]e do not think we can declare a matter 'clearly established' based on the existence of one case from another circuit."). In this case, the extent of O'Sullivan's coercion was milder than that present in *Cassady*, though this fact by itself does not mean that the Kernats were not seized. In the instant case, the Kernats' allegations at least support a reasonable inference that O'Sullivan issued his command in a "tone of voice indicating that compliance ... might be compelled," *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877, a factor that weighs in favor of finding a seizure. At the same time, however, a number of countervailing factors also are present here—O'Sullivan was the sole officer on the scene[5] and he neither displayed a weapon nor laid hands on the plaintiff.

Of course, the sum of the official inducement includes not only the threat itself, but also the consequences that would flow from not complying with it. A threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance; thus, it is reasonable to expect that a citizen's decision whether to comply with an official command would be informed by both the rock and the hard place. This proposition may be illustrated by comparing the instant case with *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194 (7th Cir.1985). The plaintiff in Rodgers alleged that his compli-

ance with a telephoned request from a police officer to come to the station house for questioning constituted an unreasonable seizure. Acknowledging that the officer may have been verbally abusive during the call, the court nevertheless concluded that no seizure had taken place for three reasons: (1) the physical distance between the officer and the citizen; (2) the distancing inherent in the tenuousness of a telephone connection; and (3) the ease with which *Rodgers* could have hung up the phone. *Id.* at 200. Significantly for our purposes here, the court added that the officer's threat to secure an arrest warrant if the citizen refused to appear did not change the outcome because the citizen "was free to demand that [the officer] do just that." *Id.* Rodgers would have ended up at the police station for questioning whether he obeyed or ignored the officer's command. While we do not wish to understate the difference between voluntarily walking to the station and being dragged there in handcuffs, we believe that the choice O'Sullivan offered—move out of your house or go to jail—was more likely to induce compliance than the choice offered to Rodgers—come down to the station of your own volition or under arrest.

■■■ Even if we conclude that the nature and degree of O'Sullivan's inducement were severe, we still must weigh in the calculus the extent to which that inducement restricted the Kernats' freedom of movement. It is worth repeating that this inquiry is inextricably intertwined with the coercive factors we considered in the preceding paragraphs; the relevant circumstances overlap though the focus differs. Among other considerations, here we especially look to the temporal and spatial aspects of the attempted restraint. *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), a case cited by the Kernats, at least inferentially supports our view that time and space are significant factors in determining whether a seizure has taken place. In *Hayes*, police officers approached a citizen at his home and asked him to accompany them to the police station for

---

5. The complaint does state that Tinley Park patrol cars occasionally drove by the house later that evening, though there is no allegation of any

further contact between the Kernats' and any member of the department.

questioning. The citizen initially refused the request, but changed his mind after the officers threatened to arrest him. The Supreme Court reversed the conviction subsequently obtained, stating that:

> [O]ur view continues to be that the line of conduct permitted by the Fourth Amendment is crossed when the police, without probable cause or a warrant, *forcibly remove* a person from his home or another place in which he is entitled to be and *transport* him to the police station where he is detained and questioned for investigative purposes.

470 U.S. at 816, 105 S.Ct. at 1646–47 (emphasis supplied). A slight variation on the facts of *Cassady* offers an even more extreme example of an officially-imposed restriction of movement: assume that a group of armed officials, guns drawn, surrounds a citizen in the doorway of her office and threatens to kill her. If that citizen then retreats into her office, locking the door and perhaps barricading it as well, it would be reasonable to conclude that she has been seized although no one laid hands on her. It is enough that as a result of a prominent show of authority she was immediately confined to a small space with no viable means of otherwise terminating the encounter. In contrast to *Rodgers, supra* at 1179, (a case in which we found no seizure), both *Hayes* and the example based on *Cassady* involved immediate threats made by persons physically present who were ready and able to carry them out, leaving no room for appeal, evasion, or compromise. Indeed, the *Hayes* and *Cassady* situations illustrate the confluence of both crucial elements of a seizure: coercive pressure from state actors resulting in a *significant,* present disruption of the targeted person's freedom of movement. In our view, a seizure typically involves an almost complete restriction of movement—either a laying of hands or a close connection (both temporally and spatially) between the show of authority and the compliance (as when a police officer tells a suspect to get in the back of the squad car but declines to handcuff him). As the extent of the limitation on a person's desired movement decreases, so too does the likelihood that even coercive police action will give rise to a seizure. For example, an officer directing persons away from an accident scene, but permitting them to travel anywhere else in the world but that one small area, surely has used a show of authority to gain compliance with his command, though no one would suggest that the officer has seized the pedestrians and motorists who had to cross the street or go around the block pursuant to his orders. Of course, none of these scenarios—both from the case law and from our imaginations—are identical to the case at hand. Nevertheless, the issues they raise clearly are relevant to the question of whether a reasonable person would have felt free to decline O'Sullivan's request.

In the instant case, we find that temporal and spatial aspects of O'Sullivan's alleged threat are much looser than those that typically characterize Fourth Amendment seizures. Though O'Sullivan was clear as to who would be arrested and where they would be taken, he was vague as to when the arrest might take place, stating only that the Kernats must comply by some indeterminate time that evening. Thus, the lapse of time between the making and the execution of O'Sullivan's threat would have been at least a matter of a few hours. In addition, O'Sullivan departed the scene immediately after issuing his command (never to return). Acknowledging that compliance with O'Sullivan's demand that they move out was an onerous task, we still think it clear that the Kernats, in contrast to Mr. Hayes and Ms. Cassady, did not have to make an instantaneous judgment whether to submit or resist. Especially in view of the fact that the Kernats had previously received conflicting advice about the authority of anyone other than the Cook County Sheriff to carry out an eviction, we find it at least plausible that a reasonable person would have sought further clarification (perhaps from the Chief of Police, the State's Attorney, or even a private lawyer).

We are mindful that these events took place over a weekend, that O'Sullivan identified himself as a "Watch Commander," and that the Kernats had several minor children (some of whom may have been in poor health)—all factors that would weigh in favor of finding a seizure if we were to actually

decide the matter. Even so, taking into account the totality of our inquiry, we cannot say that the law is clear that O'Sullivan's command, coupled with an arrest threat, constituted a seizure under the Fourth Amendment.[6] Although we also cannot state with any degree of certainty that O'Sullivan's alleged conduct did *not* violate the Constitution, all that matters is that the law did not clearly establish the unlawfulness of his actions. While O'Sullivan's alleged conduct, if true, was an arrogant, bully-like abuse of power, it was not such an elementary violation of the Fourth Amendment that the absence of a precisely analogous case is of no moment. *See K.H. ex rel. Murphy,* 914 F.2d at 851 ("There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune ... because no previous case had found liability in those circumstances."). In their briefs and at oral argument, the Kernats relied heavily on *Terry v. Ohio* to support their contention that clearly established law prohibited O'Sullivan's actions. While it is true that *Terry* stands for the proposition that in the absence of specific articulable facts upon which an officer relied as the basis of his belief that criminal activity might be afoot, a seizure, short of arrest, violates the Fourth Amendment, 392 U.S. at 21, 88 S.Ct. at 1879–80, it tells us very little about what constitutes a seizure in the first place. Moreover, *Terry's* statement that "[o]nly when the officer, by means of physical force or a show of authority in some way restrained the liberty of a citizen may we conclude that a 'seizure' occurred," *id.* at 19 n. 16, 88 S.Ct. at 1878 n. 16, is far too opaque to have established the unlawfulness of O'Sullivan's conduct. *Cassady* and *Hayes* are the most closely analogous cases cited to us or discovered by our research, but as the foregoing discussion indicates, both of those cases are distinguishable from our facts in important respects. The allegations against O'Sullivan may well give rise to a state tort claim (perhaps intentional infliction of emotional distress or false imprisonment), *cf. Cassady,* 938 F.2d at 701 (Engel, J., concurring in part and dissenting in part) (citing the discussion of the elements of false imprisonment in Prosser & Keeton, *The Law of Torts* 47–49 (5th Ed.1984)), and even at the end of the day state a Fourth Amendment claim, but considering the state of the case law, such a claim was (and is) not clearly established. Accordingly, we affirm the dismissal of the Kernats' Fourth Amendment claim against O'Sullivan.[7]

6. Of course, " '[s]eizure' alone is not enough for § 1983 liability; the seizure must also be 'unreasonable,' " *Brower,* 489 U.S. at 599, 109 S.Ct. at 1382–83, as determined "by balancing the extent of the intrusion against the need for it." *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). If these allegations had stated a clear claim of seizure, we would have had no trouble finding the seizure unreasonable.

7. Judge Crabb draws a more extreme conclusion from our analysis than is stated or intended. It is true, as she suggests, that we would not foreclose the possibility that a seizure could occur "when a person is deprived of the modicum of liberty associated with being able to stay in one particular location while remaining free to go or stay anywhere else." Op. at 1184. This is a long way, however, from concluding (a) that "the Fourth Amendment is implicated in every kind of forced compliance with an official order," op. at 1185, (b) that "any unreasonable deprivation of liberty compelled by official force amounts to a prohibited seizure," op. at 1184, or (c) that "to the extent the Kernats family was officially deprived of the ability to go about the business of their daily lives, the family was seized." Op. at 1184.

In our view, the Fourth Amendment is *implicated* only when a litigant has raised a credible claim that official coercion resulted in a significant, present disruption of his desired freedom of movement. Op. at 1180. Even so, two questions remain—(1) was there a seizure? and (2) if so, was it reasonable?—both of which are answerable only in the context of a detailed examination of the particular facts of a case. As indicated above, *supra* at 1180, a complaint seeking damages because a police officer directed the plaintiff around an accident scene would fail the "straight face" test and need not be analyzed under the Fourth Amendment. Likewise, many of the hypotheticals listed by Judge Crabb (e.g., orders to cease loitering, form a single line in a construction area, stay clear of a condemned building, etc. ...) could in no way give rise to a seizure because of the innocuous character of the compelled disruption. The Kernats' complaint alleged a far more serious disruption of movement—an order to pack up their belongings and vacate their home promptly—that, in our view, at least raises the specter of a true seizure. While, as our opinion notes, a typical seizure involves an almost complete restriction of movement

## III.

■ The Kernats also appeal the district court's dismissal of their substantive due process claim. At the outset, we note the Supreme Court's recent observation that "[a]s a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. Harker Heights,* — U.S. —, —, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Thus, the Court has determined that claims alleging substantive due process violations often are more appropriately analyzed under the more specific guarantees of the various provisions of the Bill of Rights. *See Albright,* — U.S. at —, 114 S.Ct. at 813. "Where a particular amendment 'provides an explicit textual source of. constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). As in *Graham,* the instant case involves an allegation of an unlawful seizure, so "there is no need to differentiate between a so-called Fourth Amendment theory and a substantive due process. theory because they are coextensive." *Albright,* — U.S. at —, 114 S.Ct. at 831 (Stevens, J., dissenting). The nature of the allegations falls clearly within the ambit of those activities regulated by the Fourth Amendment (even if not clearly within the ambit of the Fourth Amendment's prohibitions), and there was no need for the district court to further analyze the case under the strictures of the Fourteenth Amendment. Dismissal of the count alleging a substantive due process violation was proper (and perhaps required by *Graham* and *Albright*).

## IV.

■ Finally, we turn to the Kernats' contention that Chief Wade incurred § 1983 liability on the basis of his ratification of O'Sullivan's actions. This claim is without merit. It is well settled that the doctrine of respondeat superior may not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate that violates a citizen's constitutional rights. *Monell v. Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Supervisory liability may attach, however, where a supervisor, with knowledge of a subordinate's conduct, approves of the conduct and the basis for it. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988); *Fiorenzo v. Nolan,* 965 F.2d 348, 351 (7th Cir.1992); *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988) ("The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). Here the Kernats do not allege that Wade observed, directed, ignored, approved, participated in any way, or even knew about the incidents of November 30, December 1, or December 2, 1991, as they were taking place. The complaint simply states that Wade "ratified" O'Sullivan's conduct when he met with the Kernats several days later and when he wrote them a letter

(something akin to what Judge Crabb describes as "detention or submission to a search"), we do not read the Supreme Court's recent cases to preclude concluding that an official seizes someone when coercing him to leave a place in which he would strongly prefer to remain. We have also been unable to locate an opinion of any other court that has held one way or the other on this issue. Indeed, the lack of any case on point compels the conclusion that qualified immunity is appropriate (and dispositive) in this case and makes it unnecessary to decide whether today the facts plead by the Kernats would (or would not) give rise to a seizure. Op. at 1181; *see also* Judge Rovner's concurring opinion ("Judge Flaum leaves unanswered the ultimate question of whether the Kernats successfully alleged an unreasonable seizure under the Fourth Amendment.").

Whether a given set of facts implicates the Fourth Amendment is and always has been a matter of degree, *see supra* at 1178; *Chesternut,* 486 U.S. at 572–73, 108 S.Ct. at 1978–79 (stating that the test calls for a "contextual approach," that takes into account all of the circumstances surrounding the incident), making it difficult to set out bright-line tests in this area. Nevertheless, the twilight zone in which things are uncertain is itself finite and we are confident that our analysis neither "reshapes" the Fourth Amendment nor imposes, directly or indirectly, any new obligations on state officials.

attempting to explain and justify O'Sullivan's actions. By this time, of course, any unconstitutional seizure that may have taken place had been accomplished and Wade could have done nothing to undo that fact. Wade's *ex post* attempt to dissuade the Kernats from taking their case to the media (or the courts) by rationalizing O'Sullivan's behavior is not the type of involvement in a constitutional violation that gives rise to § 1983 liability.

## V.

The unique factual scenario alleged here has required us to consider the substantive law of seizure and the doctrine of qualified immunity, two bodies of jurisprudence in which the relevant principles are far more easily stated than applied. *Cf. McDonald*, 966 F.2d at 294. As the foregoing discussion indicates, we believe that the relevant Fourth Amendment inquiry should examine the circumstances—language, tone of voice, nature of the events leading to the encounter, location, and timing—in light of the nature of the official inducement and the extent of the restriction on the citizen's freedom of desired movement. At the same time, recognizing that today's opinion may not announce a "one size fits all" test of whether a seizure has occurred, we repeat our observation that sometimes "too rigid adherence to the formulaic prescriptions of the appellate courts (which are laid out with particular factual settings in mind and are seldom as generalizable as purported) blocks proper analysis." *Loyd v. Phillips Brothers, Inc.*, 25 F.3d 518, 521 (7th Cir.1994). Because the case law had not clearly established the unlawfulness of O'Sullivan's alleged actions as of the time he acted, O'Sullivan was entitled to qualified immunity. This does not mean, of course, that the Kernats' allegations do not state a Fourth Amendment claim (we need not and do not reach this question) or that we condone O'Sullivan's alleged behavior (we do not). But "qualified immunity typically casts a wide net," *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.1986), and here it covers O'Sullivan. The Kernats' other remaining claims were without merit. Accordingly, the judgment of the district court is

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I am pleased to join Judge Flaum's insightful discussion of existing Fourth Amendment seizure law and its implications on Officer O'Sullivan's qualified immunity from Kernats' suit. As Judge Flaum explains, at the time of the official conduct here, it was not clearly established that O'Sullivan's alleged abuse of his position of power and public trust would violate the Fourth Amendment. Having reached that conclusion, Judge Flaum leaves unanswered the ultimate question of whether Kernats successfully alleged an unreasonable seizure under the Fourth Amendment, as it is unnecessary to his conclusion with respect to the state of existing law. I fully concur in Judge Flaum's qualified immunity analysis but write separately to emphasize that, in my view, a Fourth Amendment claim was stated. Although, as Judge Flaum points out, the "temporal and spatial aspects of O'Sullivan's alleged threat" were looser than those typically characterizing Fourth Amendment seizures (*ante* at 1180), that seems to me a function only of the conduct required to avoid the threatened arrest. O'Sullivan was demanding that Kernats pack up all of her belongings, as well as her small children, and remove them from the premises within a matter of hours. In that context, Kernats was constrained to make an instantaneous judgment as to whether compliance was required. Indeed, when Kernats intimated to O'Sullivan that only the Cook County Sheriff could conduct an eviction, it is alleged that O'Sullivan reminded her that she was in Tinley Park and that he was the law in that community. I believe that response would have caused a reasonable person in Kernats' position to submit to O'Sullivan's show of authority without attempting, on a Sunday afternoon, to contact either the Chief of Police, the State's Attorney, or a private lawyer. (*See ante* at 1180.) O'Sullivan also threatened to return that evening to ensure that Kernats and her family had gone, and Kernats alleged that Tinley Park police cruisers were patrolling the neighborhood as she and her family removed their belongings. In my view, the

conduct alleged here crossed the *Hayes v. Florida* line (*see ante* at 1180), as O'Sullivan, in effect, forcibly removed Kernats and her family from their home without the legal authority to do so. Thus, were it necessary to our decision today, I would hold that Kernats alleged an unreasonable seizure in violation of the Fourth Amendment.

Contrary to what Judge Crabb has suggested in her concurring opinion, neither the majority opinion nor my own comments here have done anything to "reshape" the Fourth Amendment. (*See post* at 1186.) In my view, the majority has merely given meaning to the Supreme Court's focus in a number of Fourth Amendment cases on whether the "police conduct would 'have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (quoting *Chesternut v. Michigan*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)); *see also California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991). The Supreme Court has consistently utilized this test without producing the dire consequences Judge Crabb envisions, and I see nothing in that test that would preclude its application to circumstances such as those alleged here.

CRABB, Chief District Judge, concurring.

I concur in the result reached by the majority, but I decline to join the opinion. I do not believe that the Fourth Amendment provides the analytic framework for the Kernatses' claim and I am not prepared to hold that the family was "seized" within the meaning of the Fourth Amendment even if reasonable persons in the same circumstances would have believed that Officer O'Sullivan's threats gave them no option but to leave their rented home. In my view, the proper analysis of a claim like the Kernatses' is under the Fifth and Fourteenth Amendments, to determine whether they had a property interest in remaining on the premises they were occupying. If they did, then it would be reasonable to consider whether the officer's threats were such as to compel reasonable persons in the Kernatses' situation to leave. If they did not have a cognizable interest in staying, then they have no constitutional claim against Officer O'Sullivan, as reprehensible and unprofessional as his threats may have been.

The majority seems to suggest that a "seizure" can occur when a person is deprived of the modicum of liberty associated with being able to stay in one particular location while remaining free to go or stay anywhere else. Judge Rovner would make this explicit. I agree that the essence of the deprivation involved in a forced detention is that the detained person loses the liberty to go about his business in places where he has the right to be. The majority argues from this that any unreasonable deprivation of liberty compelled by official force amounts to a prohibited seizure, and that to the extent the Kernats family was officially deprived of the ability to go about the business of their daily lives, the family was seized. However, the court cites no case in which a court has read the Fourth Amendment this expansively. The Kernatses' able lawyer could not find any such case and neither can I. I know of no case, for example, in which a court has held that persons loitering on a street corner were seized when told to leave or that street vendors operating without a license were seized when forced away from their chosen place of business.

No other court has ever reached the conclusion Judge Rovner would reach here. Instead, courts have held that a seizure occurs when a person is detained, that is, when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) "From the time of the founding to the present, the word 'seizure' has meant a 'taking possession'. . . . For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control." *California v. Hodari D.*, 499 U.S. 621, 624, 111 S.Ct. 1547,

1549, 113 L.Ed.2d 690 (1991) (citations omitted).

The majority acknowledges that it can find no case holding that conduct such as O'Sullivan's violated the Kernatses' clearly established rights under the Fourth Amendment, but argues that the Supreme Court has changed the framework for analysis of the plaintiffs' "novel claim." To the extent that the majority believes the Supreme Court has expanded the concept of a seizure to encompass official compulsion that does not amount to a detention, I disagree respectfully. Not one of the cases decided since *Mendenhall* changes the basic understanding that a seizure requires detention or submission to a search. Not one involves a person instructed to leave a particular location.

It is true that in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court found the "free to leave" analysis inapplicable to the questioning of passengers aboard a bus because leaving the bus was not a reasonable alternative for the passengers. The Court described the test for a seizure as whether the "police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437, 111 S.Ct. at 2387 (quoting *Chesternut v. Michigan*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)). The Court recast the "free to leave" test, but only to fit the situation in which a person's movements are confined by a factor independent of police conduct. The Court remained concerned with the extent to which official actions amount to a forced *detention* of the person. As the Court stated, the test announced in *Bostick* "follows logically from prior cases and breaks no new ground." *Id.* at 437, 111 S.Ct. at 2387. Certainly neither *Bostick* nor any other case suggests that the Fourth Amendment is implicated in every kind of forced compliance with an official order.

Judge Rovner emphasizes the holding in *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), implying that it supports the conclusion that forcing a person out of his home is a Fourth Amendment violation. In fact, the focus in *Hayes* was not on whether Hayes had been forced out of his house by official threats of arrest, but whether the police had probable cause to take him to the police station and detain him there for investigative purposes. The outcome would have been no different if the police had come upon Hayes at a baseball field and given him the same choice of coming with them voluntarily or submitting to an arrest. The determinative factor was that he was made to go to the police station to be detained for investigation, not that he was forced to leave a particular place.

The majority is correct when it says that the courts have found compulsion in the absence of an actual "hands-on" arrest. But that is only half the issue. Even if reasonable persons in the Kernatses' circumstances would have been felt compelled to comply with O'Sullivan's directives to leave their home, that compliance must amount to a seizure within the meaning of the Fourth Amendment. In my view, it did not. The act required of the Kernats family was leaving the premises. They were not compelled to submit to a detention or to a search. In these circumstances, Fourth Amendment law is not implicated.

The majority's approach to this case would expand Fourth Amendment law into areas it was never intended to reach. The majority does not suggest that it would limit its characterization of a seizure to only those orders of exclusion involving the home. Indeed, I see no way in which such a limitation could be justified. It is not frivolous, therefore, to suggest that equating a seizure with any kind of officially coerced compliance raises the specter of evaluating the reasonableness under the Fourth Amendment of police orders to clear a crime scene, form a single line in a highway construction area, stay out of a condemned building or move away from a convenience store.

My colleagues are troubled, as am I, by the alleged unauthorized show of force by Officer O'Sullivan and by the undeniably poignant aspects of the forced eviction of the Kernats family. If Officer O'Sullivan did what the Kernatses allege, his arrogation of authority and misuse of his position are the kind of official conduct the Civil Rights Acts

**1186**

were intended to address. On the other hand, the actual wrong done to the Kernatses is negligible. As difficult as their circumstances were, they suffered nothing that they would not have suffered had it been a properly authorized deputy sheriff who came to their door and directed them to leave. The Kernatses do not argue that they had a property right to remain in the rented house; the state court had determined that they had no such right and the Kernatses do not suggest that they enjoyed a property right to stay until the proper official came to evict them.

The Kernatses contended that O'Sullivan deprived them of a liberty interest arising out of their right to live together as a family because the family was unable to find alternative housing to accommodate the entire family that night. I agree with Judge Flaum that it was proper for the district court to dismiss this claim but my agreement rests on the lack of merit of the claim (the temporary breakup of the family was not a foreseeable result of Officer O'Sullivan's actions). I would not dismiss it on the authority of *Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), because of my conviction that the Fourth Amendment does not provide "an explicit textual source of constitutional protection" applicable to the conduct alleged. *Id.* at ——, 114 S.Ct. at 813.

It does not follow, either from the Kernatses' unfortunate circumstances or from the lack of a means of obtaining relief under § 1983; that the judicial response should be to reshape the Fourth Amendment. As disturbed as I am by the Kernatses' situation, I am more disturbed by the prospect of suggesting to public employees in this indirect manner that they will have to be prepared to justify under a Fourth Amendment standard any order that results in compelled compliance.